T.C. Summary Opinion 2007-180

UNITED STATES TAX COURT

SUZANNE E. BARRERA, a.k.a. SUZANNE E. BATTLE, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 254-04S.              Filed October 24, 2007.

Noel W. Burns, for petitioner.

Timothy Maher, for respondent.

PANUTHOS, Chief Special Trial Judge:[1]  This case was heard

pursuant to the provisions of section 7463[2] of the Internal

_____

[1]  With the consent of the parties, the Chief Judge
reassigned this case, after the death of Special Trial Judge
Carleton D. Powell, to Chief Special Trial Judge Peter J.
Panuthos, for disposition on the existing record.

[2]   Unless otherwise indicated, subsequent section
references are to the Internal Revenue Code in effect for the
                                        (continued...)

Revenue Code in effect when the petition was filed. Pursuant to section 7463(b), the decision to be entered is not reviewable by any other court, and this opinion shall not be treated as precedent for any other case.

Petitioner seeks equitable relief from joint and several liability under section 6015(f) for unpaid Federal income taxes arising from joint returns filed with Roberto E. Barrera (Mr. Barrera) for taxable years 1998, 1999, and 2000.[3]

## Background

Petitioner resided in Miami-Dade County, Florida, at the time she filed her petition.

Petitioner and Mr. Barrera were married in June 1995. Petitioner was not abused by Mr. Barrera at any time during their marriage.

For the taxable years 1995 through 2002, petitioner and Mr. Barrera filed joint Forms 1040, U.S. Individual Income Tax Return. Petitioner did not prepare the joint returns; they were

---

[2](...continued)
years in issue, and Rule references are to the Tax Court Rules of Practice and Procedure.

[3] Pursuant to Rule 325 and sec. 6015(e)(4), petitioner's former husband, Roberto E. Barrera (Mr. Barrera), was served with notice of the filing of the petition in this case and his right to intervene. Respondent represented at trial that Mr. Barrera notified respondent, in a letter dated Mar. 16, 2004, and received by respondent on Apr. 30, 2004, that he does not intend to intervene in this matter. Petitioner did not dispute respondent's representation.

prepared by a professional return preparer engaged by Mr. Barrera.

At some point prior to her marriage to Mr. Barrera but not further disclosed in the record, petitioner married for the first time, and she divorced sometime in 1993 or 1994. Petitioner and her first husband filed joint Federal income tax returns during their marriage. Petitioner did not prepare the joint returns. Petitioner signed the joint returns, but she did not review them. Petitioner never had any kind of tax problems with the Internal Revenue Service (IRS) prior to 1995, and she believed she was fully compliant with her tax filing and payment obligations up until that time.

At the time of her marriage to Mr. Barrera in 1995, petitioner was a college graduate, having earned a degree in business management from Florida International University in 1991. Her course work for this degree included classes in accounting, finance, and business law.

While in college, petitioner worked as a mortician for a local funeral home. After graduation in 1991, she started working in the mortgage business as a loan officer for a mortgage brokerage company called Financial Research Services. Petitioner's duties as a loan officer primarily consisted of helping individuals apply for mortgage loans by preparing a form "1003", which is a Federal National Mortgage Association

residential mortgage loan application.  Petitioner's preparation of these applications included ensuring that required documents such as the applicant's bank statements were included and that the application was properly assembled and complete.  Petitioner would then follow each application until the mortgage loan closed.

At the time petitioner married Mr. Barrera, he was the owner of Financial Research Services, the mortgage brokerage company where petitioner was employed.  Petitioner was never an officer of Financial Research Services, nor did she have an ownership interest in the company separate from that of Mr. Barrera's interest.  After her marriage to Mr. Barrera, petitioner stopped working as a loan officer at Financial Research Services. Thereafter, up until her pregnancy with her daughter in 1996, petitioner occasionally worked at Financial Research Services, going in to perform filing or other clerical work on an as-needed basis.

During the first years of their marriage, petitioner and Mr. Barrera lived a very nice and comfortable life.  They lived in what petitioner considered a "fabulous" house in a community in Miami-Dade County known as Pine Bay Estates (Pine Bay Estates house).  They had two children, a daughter born in 1997 and a son in 1998, and petitioner was a stay-at-home mother.  The family

traveled, often in a plane owned and piloted by Mr. Barrera, to places including the Carribean and New York.

Mr. Barrera was the primary earner in the marriage. He was responsible for the family's finances, and he paid the family bills. Petitioner did not discuss the payment of bills with Mr. Barrera, nor did she question Mr. Barrera about money. Petitioner felt that, in her family, Mr. Barrera's job was to pay the bills, and her job was to raise the children.

Petitioner and Mr. Barrera maintained separate bank accounts and credit cards throughout their marriage. During the first years of their marriage, when petitioner needed spending money for herself or for the household, she would ask Mr. Barrera for money. He would then write her a check, which she deposited into her bank account. Mr. Barrera never refused petitioner's requests for money, and there was always money available whenever petitioner requested it.

In June 1996, petitioner and Mr. Barrera timely filed (under extension) their joint return for taxable year 1995. The 1995 joint return reported adjusted gross income of $199,170, and tax due of $42,149, which amount was paid by petitioner and Mr. Barrera.

In 1997, Financial Research Services and Mr. Barrera became the subject of a Federal criminal investigation. As a result of this investigation, Mr. Barrera lost his mortgage broker license

and Financial Research Services went out of business some time in late 1997 or early 1998. Despite the loss of his mortgage broker license, Mr. Barrera was able to work with Federal Housing Administration "Title I" home improvement loans, and, in 1998, he continued this activity in a new business venture called Tropical Funding.

In December 1997, petitioner and Mr. Barrera untimely filed their joint return for taxable year 1996. The 1996 joint return reported adjusted gross income of $149,446, and tax due of $27,389, which amount was paid by petitioner and Mr. Barrera.

After the closure of Financial Research Services, petitioner's lifestyle began to change, and from 1998 onwards, she and her family were living less comfortably. Throughout 1998 and 1999, Mr. Barrera was paying living expenses and family bills with credit cards or early distributions from his individual retirement account (IRA), though he did not tell petitioner he was doing this. Mr. Barrera ran the household the same way, and petitioner never asked Mr. Barrera about money during this time, as she continued to feel it was "just not * * * [her] concern."

At some point in 1998, respondent began an examination that included petitioner and Mr. Barrera's joint Federal income tax returns for taxable years 1995 and 1996. As a result of this exam, petitioner and Mr. Barrera agreed to respondent's determination of a deficiency for taxable year 1995 in the amount

of $14,340,[4] which amount was assessed by respondent on February 8, 1999.  At some point in 1998 or 1999, Mr. Barrera explained to petitioner that the tax problems with the IRS stemmed from expenses of his mortgage brokerage business that the IRS reclassified as personal expenses and disallowed as business expense deductions.

By late 1999 and into 2000, petitioner saw that Mr. Barrera was working "less and less" at his successor home improvement loan business, that cash was not coming in from Mr. Barrera's business as it had been earlier in their marriage, and that Mr. Barrera did not have the same type of income anymore.  Petitioner felt that, although Mr. Barrera continued to act like "everything was fine", their financial situation was changing.

In late 1999, petitioner and Mr. Barrera put their Pine Bay Estates house on the market.  Petitioner did not want to sell the Pine Bay Estates house and was not happy that it had to be sold. When the Pine Bay Estates house had to be sold, petitioner knew there were financial problems facing her family.

Around this same time, Mr. Barrera approached petitioner about withdrawing money from her IRA, and she initially refused Mr. Barrera's request.  By the time she and Mr. Barrera were trying to sell their Pine Bay Estates house, however, petitioner

---

[4]  No deficiency was determined by respondent with respect to petitioner and Mr. Barrera's joint return for taxable year 1996.

knew things were "not well" financially and that she had to get the distribution from her IRA. After some argument with Mr. Barrera, petitioner finally agreed to her husband's request and, in 2000, received a $20,000 distribution from her IRA. Petitioner knew at the time there would be tax consequences as a result of this $20,000 distribution from her IRA.

In 2000, Mr. Barrera quit renting commercial office space for his home improvement loan business and moved the office into his and petitioner's home. At that time, petitioner realized that Mr. Barrera could no longer pay the rent for his commercial office space and further realized that he was not earning any substantial sums of money.

Also in 2000, petitioner took a part-time job as a sales clerk at Capretto Shoes, a local shoe store. This was petitioner's first employment outside the home since her pregnancy with her daughter in 1996. Thereafter, petitioner began paying family expenses.

In October 2000, the Pine Bay Estates house sold after about a year on the market. Petitioner believed the net proceeds of the sale to be approximately $150,000. Thereafter, she and Mr. Barrera purchased a house in the West Kendall area of Miami-Dade County (West Kendall house) for approximately $234,000 to $236,000. The West Kendall house was smaller and less expensive

than the Pine Bay Estates house, and petitioner considered it to be "mediocre" compared to the Pine Bay Estates house.

On May 30, 2000, petitioner and Mr. Barrera untimely filed their joint return for taxable year 1998, 9 months past the extended due date of August 15, 1999.  The 1998 joint return reported negative adjusted gross income of "-9,161", "total tax" due of $4,237, "total payments" of $500 (which had been paid on April 15, 1999, with a timely filed Form 4868, Application for Automatic Extension of Time To File U.S. Individual Income Tax Return), and a balance due of $3,737 on the line stating "AMOUNT YOU OWE".  The entire $3,737 tax balance reported as owing for 1998 was attributable to self-employment tax on income earned by Mr. Barrera from his activities as a "business consultant", which he reported on a Schedule C, Profit or Loss From Business, attached to the 1998 joint return.  Petitioner did not report any income on the 1998 joint return.  The $3,737 tax liability (plus additions to tax and interest) for taxable year 1998 has not been paid and is still outstanding.

On November 15, 2000, petitioner and Mr. Barrera untimely filed their joint return for taxable year 1999, 7 months past the due date of April 15, 2000.  The 1999 joint return reported adjusted gross income of $14,165, "total tax" due of $2,905, "total payments" of "0", and a balance due of $2,905 on the line stating "AMOUNT YOU OWE".  The entire $2,905 tax balance reported

as owing for taxable year 1999 arose from the 10-percent additional tax imposed by section 72(t) on early distributions from qualified retirement plans, which was imposed on a $38,261 distribution Mr. Barrera received from his IRA.[5]  The $2,905 tax liability (plus additions to tax and interest) for taxable year 1999 has not been paid and is still outstanding.

On August 6, 2001, petitioner and Mr. Barrera timely filed (under extension) their joint return for taxable year 2000.  The 2000 joint return reported adjusted gross income of $24,446, "total tax" of $3,712, "total payments" of "0", and a balance due of $3,712 on the line stating "amount you owe".  The entire $3,712 tax balance reported as owing for taxable year 2000 arose from the 10-percent additional tax under section 72(t) imposed on IRA distributions totaling $37,119, which included the $20,000 distribution from petitioner's IRA.[6]  The $3,712 tax liability (plus additions to tax and interest) for taxable year 2000 has not been paid and is still outstanding.

During petitioner's marriage to Mr. Barrera, Mr. Barrera was responsible for the preparation of the Federal income tax

_____

[5]  Petitioner, in her individual capacity, received interest income of $79 in taxable year 1999, but no part of the $2,905 balance reported as owing on the 1999 joint return was attributable to petitioner's interest income.

[6]  Petitioner, in her individual capacity, received interest income of $19 in taxable year 2000, but no part of the $3,712 tax balance reported as owing on the 2000 joint return was attributable to petitioner's interest income.

returns. Petitioner would sign a tax return when Mr. Barrera placed the return in front of her and told her to sign. Petitioner did not notice when signing a joint return whether the return was timely or late. Petitioner did not review a joint return when she signed it because Mr. Barrera was her husband and she trusted him to ensure that their tax returns were properly completed and filed.

Petitioner and Mr. Barrera's joint returns for taxable years 1998, 1999, and 2000, were completed by the same paid return preparer. Petitioner voluntarily signed these returns, but she did not fill in the dates that appear next to her signatures on the returns. Petitioner did not know the dates she signed the 1998, 1999, or 2000 joint returns, nor did she recall whether these returns were timely or late at the times she signed them.

The joint return for 1998 shows a handwritten date of "5/25/99" next to the signature of the paid return preparer. The 1998 return shows a handwritten date of "5-23-00" next to both petitioner's and Mr. Barrera's signatures. The handwriting of the date next to petitioner's signature appears to be the same as the handwriting of Mr. Barrera's signature. The 1998 return bears an IRS stamp showing it was received by the IRS on May 30, 2000.

The joint return for taxable year 1999 shows a typed date of "11-02-00" next to the signature of the paid return preparer.

The 1999 return also shows a typed date of "11-02-00" next to both petitioner's and Mr. Barrera's signatures.  The 1999 return bears an IRS stamp showing it was received by the IRS on November 15, 2000.

The joint return for taxable year 2000 shows a typed date of "7/24/01" next to the signature of the paid return preparer.  The 2000 return also shows a typed date of "7/24/01" next to both petitioner's and Mr. Barrera's signatures.  The 2000 return bears an IRS stamp showing it was received by the IRS on August 6, 2001.

Petitioner did not review or otherwise page through the joint returns for taxable year 1998, 1999, or 2000, nor did she request the opportunity to review the returns, prior to signing them.  Petitioner never questioned Mr. Barrera about the preparation or filing of the 1998, 1999, or 2000 joint returns, and she never questioned him about payment of the tax liabilities reported on the returns because she did not look to see whether a return showed any tax due at the respective times she signed the returns.  Mr. Barrera did not physically or otherwise prevent petitioner from paging through the returns, and, had she wanted to, petitioner could have looked through the returns when she signed them.  Petitioner signed these returns without review because she trusted that Mr. Barrera "would do the best" for her and her family.

On July 24, 2000, the IRS issued a Statutory Notice of Intent to Levy to Mr. Barrera and petitioner with respect to their unpaid tax liability for taxable year 1998 (1998 collection notice).[7] Petitioner did not read the 1998 collection notice from the IRS. During her marriage, petitioner would not open letters jointly addressed to both her and Mr. Barrera because Mr. Barrera took care of all jointly addressed correspondence and petitioner felt such letters were for Mr. Barrera. Petitioner recalled that letters from the IRS had come to the house during this time, but because such letters were addressed to petitioner and Mr. Barrera jointly, they went straight to Mr. Barrera.

Petitioner and Mr. Barrera timely filed joint returns for taxable years 2001 and 2002 showing adjusted gross income of $2,108 and $24,886, respectively. The taxes reported as owed on the returns were timely paid. Petitioner was the sole earner in her family during 2001 and 2002 and due to excess withholding from her job at Capretto Shoes and credits, she had overpayment credits of $2,804 and $3,288 with respect to her income taxes for 2001 and 2002, respectively. Respondent did not refund these overpayment credits to petitioner, but instead transferred the

_____

[7] The 1998 collection notice was not in respondent's administrative record and was not presented as evidence at trial. Respondent introduced Form 4340, Certificate of Assessments, Payments, and Other Specified Matters, dated May 4, 2004, for taxable year 1998 to show that the 1998 collection notice was issued to Mr. Barrera and petitioner on July 24, 2000.

overpayment credits to petitioner and Mr. Barrera's outstanding tax liabilities for taxable years 1998, 1999, and 2000.

On September 13, 2002, petitioner filed Form 8857, Request for Innocent Spouse Relief (And Separation of Liability and Equitable Relief) (Form 8857), with the IRS seeking relief from joint and several liability for taxable years 1998, 1999, and 2000.[8]  Mr. Barrera prepared and filled out the Form 8857 for petitioner, and petitioner signed and dated it.  Petitioner did not read or otherwise review the Form 8857 when she signed it. Mr. Barrera explained to petitioner that the innocent spouse relief related to tax issues arising from the failure of his mortgage brokerage business.  From Mr. Barrera's explanation, petitioner understood the Form 8857 to mean that whatever happened with respect to Mr. Barrera's mortgage brokerage business would relate only to the business and thus would never affect her.  Petitioner did understand that Mr. Barrera's mortgage brokerage business was organized as a corporation and

_____

[8]  In her Form 8857, petitioner also sought relief under sec. 6015 with respect to taxable years 1994, 1995, 1996, 1997, and 2001.  As discussed infra, the IRS granted petitioner relief under sec. 6015(c) with respect to taxable year 1995, and that year is not at issue in the instant case.  Taxable year 1994 was not further considered because petitioner was not married to Mr. Barrera in 1994 and did not file a joint return with him for that year.  Taxable years 1996, 1997, and 2001 were also not further considered because petitioner and Mr. Barrera did not have outstanding tax liabilities for those years.

that it filed a corporate income tax return separate from her and Mr. Barrera's personal return.

On September 30, 2002, at the request of the IRS, petitioner completed a Questionnaire for Requesting Spouse (questionnaire). Part 2 (relating to requests for relief from a balance due shown on a filed return but not paid) and Part 4 (information about average monthly household income and expenses to determine whether paying the tax liability would leave the requestor unable to meet basic living expenses) of the questionnaire were left blank and not otherwise completed.

On October 4, 2002, in connection with the Federal investigation of his mortgage brokerage business, Mr. Barrera pleaded guilty to conspiring to defraud the United States and was sentenced to 27 months' incarceration. Mr. Barrera started serving his sentence at a Federal correctional facility in Alabama in April 2003. After his conviction and prior to the start of his incarceration, Mr. Barrera continued to reside with petitioner and their children because petitioner knew Mr. Barrera had no money and felt that he had nowhere else to live.

In April 2003, after Mr. Barrera's incarceration, petitioner learned she had a tax problem when she received correspondence from the IRS. Prior to this time, petitioner did not believe she had a tax problem because she had signed the Form 8857 in

September 2002, and she had not read any of the correspondence from the IRS which was jointly addressed to her and Mr. Barrera.

Sometime in 2003, respondent granted petitioner's request for relief from joint and several liability for taxable year 1995 under the provisions of section 6015(c). Respondent did not possess, and could not produce at trial, a copy of the notice of determination for taxable year 1995, but stipulated that petitioner's request for relief was granted for that year under the provisions of section 6015(c).

On October 7, 2003, in a notice of final determination, respondent advised petitioner that she was not entitled to equitable relief from joint and several liability under section 6015(f) for taxable years 1998, 1999, and 2000. Respondent did not grant petitioner's request because petitioner "had no belief the taxes would be paid at the time * * * [she] signed the joint tax returns."[9] Petitioner thereafter timely filed her petition with this Court.

In March 2004, petitioner filed a petition for dissolution of her marriage to Mr. Barrera in the appropriate Florida court (marriage dissolution action). At the time of trial in the

---

[9] The Oct. 7, 2003, final notice of determination did not state or otherwise indicate whether respondent evaluated petitioner's claim using the applicable procedures outlined in Rev. Proc. 2000-15, 2000-1 C.B. 447.

instant case, the marriage dissolution action was pending, and petitioner and Mr. Barrera were still legally married.

As part of the marriage dissolution action, petitioner and Mr. Barrera entered into a Marital Settlement Agreement on May 20, 2004 (marital settlement agreement), to settle, among other things, their rights with respect to marital property and their obligations for marital debts and child support.  Under the section of the marital settlement agreement titled, "REAL PROPERTY DIVISION", the West Kendall house became the sole property of petitioner, and she assumed responsibility for the mortgage on the property.  Under the section titled "DEBTS", petitioner and Mr. Barrera agreed to each pay the consumer debts that were in their individual names.  With respect to tax debts, the section acknowledged: "there exists a substantial federal income tax deficiency for joint tax returns filed for 1998, 1999, 2000, and 2001", and provided that "Husband agrees to assume said federal income tax liability in its entirety and agrees to hold wife harmless for all outstanding income tax liabilities which may result from having filed a joint return with him."  The potential tax liabilities were further addressed in a separate section titled "TAXES", which provided that

> there is currently an outstanding federal income tax liability of an undetermined amount as a result of the parties filing a joint tax return for the tax years 1998, 1999, 2000, and 2001.  Husband hereby admits that all such liability is attributable to him and promises to hold Wife harmless and indemnify her for all such

tax deficiency, and for any damages incurred by Wife as a result thereof.

Under "CHILD SUPPORT", Mr. Barrera was obligated to pay petitioner for the support and maintenance of the couple's two minor children; however, the amount of child support could not "reasonably be calculated" in the marital settlement agreement due to Mr. Barrera's "current situation"; i.e., his incarceration at the Federal correctional facility.

At the time of trial in this case, petitioner was supporting herself and her two children without, as acknowledged in the marital settlement agreement, child support from Mr. Barrera. Petitioner continued to work as a sales clerk at Capretto Shoes, where she earned $15 an hour.  Petitioner worked full time at Capretto Shoes and believed she brought home about $1,200 to $1,300 a month from this job.  Petitioner used credit cards, in addition to her earnings, to pay her and her family's living expenses, and she also received occasional monetary assistance from her family.

Petitioner and her children continued to reside in the West Kendall house, which petitioner owned solely in her name. Petitioner's mortgage on the West Kendall house, at the time of trial, was approximately $210,000.

Petitioner's monthly expenses at the time of trial included a monthly mortgage payment for the West Kendall house of $1,000, plus taxes and insurance, preschool expenses of $400 a month for

her son (although this expense was expected to end the following school year when her son would start kindergarten), and payments to a live-in nanny of $270 a week. Petitioner's monthly expenses also included food, clothing for her and the children, vehicle expenses, and homeowners' association dues.

Respondent has not determined a deficiency in income tax against petitioner or Mr. Barrera for taxable year 1998, 1999, or 2000. As of the date of trial in this case, petitioner's outstanding liabilities for underpayments of income taxes (and additions to tax and interest) totaled $5,314.93 for taxable year 1998, $4,030.65 for taxable year 1999, and $3,836.82 for taxable year 2000.[10]

## Discussion

In general, married taxpayers filing a joint Federal income tax return are each fully responsible for the accuracy of the return and jointly and severally liable for the entire tax due. Sec. 6013(d)(3); Butler v. Commissioner, 114 T.C. 276, 282 (2000). Section 6015, however, may provide relief from joint and several liability under certain limited circumstances. Because the relief sought in this case is from liabilities for taxes

---

[10] The outstanding tax liabilities for taxable years 1998, 1999, and 2000 remained unpaid as of Dec. 20, 2006. Accordingly, this Court has jurisdiction under sec. 6015(e)(1) to determine the appropriate relief available to petitioner under sec. 6015(f) with respect to those liabilities. See Tax Relief and Health Care Act of 2006, Pub. L. 109-432, div. C, sec. 408, 120 Stat. 3061.

reported on petitioner's joint returns for taxable years 1998, 1999, and 2000 and assessed based on those returns, but not paid, only section 6015(f) is applicable. See sec. 6015(b)(1) and (c)(1); <u>Washington v. Commissioner</u>, 120 T.C. 137, 146-147 (2003).

Section 6015(f) provides, in pertinent part, that a taxpayer may be relieved of liability for any unpaid tax (or any portion thereof) if, taking into account all the facts and circumstances, it would be inequitable to hold the taxpayer liable. If the Commissioner denies a taxpayer's request for equitable relief under section 6015(f), this Court has jurisdiction to determine the appropriate relief available to the taxpayer under that section. Sec. 6015(e). The taxpayer seeking equitable relief under section 6015(f) bears the burden of proving his or her entitlement to such relief. Rule 142(a); <u>Alt v. Commissioner</u>, 119 T.C. 306, 311 (2002), affd. 101 Fed. Appx. 34 (6th Cir. 2004).

As directed by section 6015(f), the Commissioner has prescribed procedures for use in determining whether a taxpayer qualifies for equitable relief from joint and several liability under section 6015(f). The procedures applicable to the instant case are set forth in Rev. Proc. 2000-15, 2000-1 C.B. 447.[11]

---

[11] Rev. Proc. 2000-15, 2000-1 C.B. 447, has been superseded by Rev. Proc. 2003-61, 2003-2 C.B. 296, effective for requests for relief filed on or after Nov. 1, 2003, and for requests for relief pending on Nov. 1, 2003, as to which no

(continued...)

This Court has upheld the use of these procedures and has analyzed the factors listed therein in reviewing a negative determination under section 6015(f). See, e.g., Washington v. Commissioner, supra at 147-152; Jonson v. Commissioner, 118 T.C. 106, 125-126 (2002), affd. 353 F.3d 1181 (10th Cir. 2003).

Rev. Proc. 2000-15, sec. 4.01, 2000-1 C.B. at 448, lists seven threshold conditions that must be satisfied before the Commissioner will consider a request for relief under section 6015(f). Respondent agrees that these threshold conditions are satisfied for taxable years 1999 and 2000, but he contends that petitioner fails to satisfy the condition enumerated at Rev. Proc. 2000-15, sec. 4.01(3), 2000-1 C.B. at 448, for taxable year 1998.

The threshold condition at Rev. Proc. 2000-15, sec. 4.01(3), 2000-1 C.B. at 448, requires that the "requesting spouse applies for relief no later than two years after the date of the Service's first collection activity after July 22, 1998, with respect to the requesting spouse".[12] According to respondent,

---

[11](...continued)
preliminary determination letter had been issued as of that date. Petitioner's request for relief was filed on Sept. 13, 2002, and respondent's notice of determination denying relief was issued on Oct. 7, 2003. Accordingly, petitioner's request is subject to Rev. Proc. 2000-15, supra.

[12] See also sec. 1.6015-5(b)(1), Income Tax Regs., which is applicable for all elections under sec. 6015 filed on or after July 18, 2002. Sec. 1.6015-9, Income Tax Regs.

the 1998 collection notice issued to petitioner and Mr. Barrera on July 24, 2000, was a collection due process notice issued under section 6330, and it thus constituted a "collection activity" for taxable year 1998. Because petitioner filed her request for relief on September 13, 2002, approximately 26 months after this first collection activity for taxable year 1998, respondent contends that petitioner's request is untimely and she does not qualify for relief with respect to taxable year 1998.

We agree with respondent that a section 6330 notice, which is a notice sent providing a taxpayer notice of the Commissioner's intent to levy and of the taxpayer's right to a section 6330 collection due process hearing, constitutes a "collection activity" for purposes of section 6015. See sec. 1.6015-5(b)(2)(i) and (ii), Income Tax Regs. Under the Internal Revenue Service Restructuring and Reform Act of 1998 (RRA 1998), Pub. L. 105-206, sec. 3501(b), 112 Stat. 770, the Commissioner must include in such collection-related notices a description of a taxpayer's right to relief under section 6015. The 1998 collection notice sent to petitioner and Mr. Barrera was not in respondent's administrative record and was not presented as evidence at trial. There is no evidence that the 1998 collection notice informed petitioner of her right to apply for relief under section 6015, as required by RRA 1998 sec. 3501(b). See McGee v. Commissioner, 123 T.C. 314, 317-319 (2004); see also Nelson v.

Commissioner, T.C. Memo. 2005-9. Petitioner's testimony indicates that she was not aware of her right to request relief under section 6015 until her husband presented her with Form 8857 to sign in September 2002. In addition, respondent did not deny petitioner's request for relief for taxable year 1998 based upon the 2-year time limit but instead appears to have evaluated petitioner's request under the list of factors provided in Rev. Proc. 2000-15, secs. 4.02 and 4.03, 2000-1 C.B. at 448-449. Under these circumstances, we do not find it necessary to decide whether the 2-year limitation period bars petitioner's request for relief for taxable year 1998.[13] Accordingly, we include that year in our determination of the appropriate relief available to petitioner under section 6015(f).

If a requesting spouse has satisfied the seven threshold conditions of Rev. Proc. 2000-15, sec. 4.01, 2000-1 C.B. at 448, then Rev. Proc. 2000-15, sec. 4.02, provides that, in cases where a liability reported on a joint return is unpaid, relief under section 6015(f) will ordinarily be granted where all of the following elements are satisfied: (1) At the time relief is requested, the requesting spouse is no longer married to, or is

_____

[13] We also note that respondent granted petitioner relief under sec. 6015(c) for taxable year 1995, which petitioner requested in her Form 8857 filed on Sept. 13, 2002, even though respondent's Form 4340 for that year, dated May 5, 2004, indicates that a collection notice for the 1995 liability was issued on Oct. 14, 1999, which was similarly more than 2 years before the date petitioner filed her Form 8857.

legally separated from, the nonrequesting spouse, or has not been a member of the same household as the nonrequesting spouse at any time during the 12-month period ending on the date relief was requested; (2) at the time the return was signed, the requesting spouse had no knowledge or reason to know that the tax would not be paid; and (3) the requesting spouse will suffer economic hardship if relief is not granted.[14]

Petitioner and Mr. Barrera were still married and living in the same household when petitioner filed her Form 8857 in September 2002, and petitioner concedes that she does not meet the first element listed above. Accordingly, we conclude that petitioner does not qualify for relief under Rev. Proc. 2000-15, sec. 4.02, 2000-1 C.B. at 448.

Where a requesting spouse satisfies the threshold conditions of Rev. Proc. 2000-15, sec. 4.01, 2000-1 C.B. at 448, but does not qualify for relief under Rev. Proc. 2000-15, sec. 4.02, equitable relief may still be granted under section 6015(f) if, taking into account all the facts and circumstances, it would be inequitable to hold the requesting spouse liable for all or part of the unpaid liability. Rev. Proc. 2000-15, sec. 4.03, 2000-1 C.B. 448, provides a list of positive factors and negative factors that may be considered in determining whether it would be

---

[14] Relief under Rev. Proc. 2000-15, sec. 4.02, 2000-1 C.B. at 448, is available only to the extent that the unpaid liability is allocable to the nonrequesting spouse.

inequitable to hold the requesting spouse liable for all or part of the unpaid liability.

The positive factors that, if present, weigh in favor of relief include: (1) The requesting spouse is separated or divorced from the nonrequesting spouse; (2) the requesting spouse would suffer economic hardship if relief were not granted; (3) the requesting spouse was abused by the nonrequesting spouse; (4) the requesting spouse did not know or have reason to know that the reported liability would not be paid; (5) the nonrequesting spouse has a legal obligation pursuant to a divorce decree or agreement to pay the unpaid liability;[15] and (6) the unpaid liability is attributable solely to the nonrequesting spouse. Rev. Proc. 2000-15, sec. 4.03(1), 2000-1 C.B. at 449.

The negative factors that, if present, weigh against relief include: (1) The unpaid liability is attributable to the requesting spouse; (2) the requesting spouse knew or had reason to know that the reported liability would be unpaid at the time the return was signed; (3) the requesting spouse significantly benefited (beyond normal support) from the unpaid liability; (4) the requesting spouse will not experience economic hardship if relief is not granted; (5) the requesting spouse has not made a

---

[15] According to Rev. Proc. 2000-15, sec. 4.03(1)(e), 2000-1 C.B. at 449, however, "This will not be a factor weighing in favor of relief if the requesting spouse knew or had reason to know, at the time the divorce decree or agreement was entered into, that the nonrequesting spouse would not pay the liability."

good faith effort to comply with Federal income tax laws in the tax years following the tax years to which the request for relief relates; and (6) the requesting spouse has a legal obligation pursuant to a divorce decree or agreement to pay the unpaid liability. Rev. Proc. 2000-15, sec. 4.03(2), 2000-1 C.B. at 449.

As Rev. Proc. 2000-15, sec. 4.03, 2000-1 C.B. at 448, makes clear, no single factor is to be determinative in any particular case, all factors are to be considered and weighed appropriately, and the list of factors is not intended to be exhaustive.

Respondent contends that petitioner has not demonstrated that any of the factors weighs in favor of equitable relief. Accordingly, we examine each factor in turn.

1.    Marital Status

Petitioner and Mr. Barrera were still married when petitioner filed her Form 8857 in September 2002, which fact disqualified petitioner under Rev. Proc. 2000-15, sec. 4.02, 2000-1 C.B. at 448. The following month, however, in October 2002, Mr. Barrera was sentenced to a 27-month term in a Federal correctional facility, which he began serving in April 2003. Thereafter, in March 2004, petitioner filed for dissolution of her marriage to Mr. Barrera, and the action was pending at the time this case was tried.[16] Thus, petitioner has lived apart

_____

[16] On the issue of her marital status, petitioner relies on a document that she attached to her posttrial memorandum and
                                                      (continued...)

from Mr. Barrera since April 2003 and has instituted divorce proceedings. Given the overall record, we view this factor as weighing in favor of relief.

2. Economic Hardship

A requesting spouse would suffer economic hardship if payment of the liability, in whole or in part, would cause the taxpayer to be unable to pay his or her reasonable basic living expenses. Rev. Proc. 2000-15, sec. 4.03(1)(b) and (2)(d), 2000-1 C.B. at 448-449; see also sec. 301.6343-1(b)(4), Proced. & Admin. Regs.[17] In determining a reasonable amount for basic living expenses, we consider, among other things: (1) The taxpayer's age, employment status and history, ability to earn, and number of dependents; (2) the amount reasonably necessary for food, clothing, housing, medical expenses, transportation, current tax payments, alimony, child support or other court-ordered payments, and expenses necessary to the taxpayer's production of income; (3) the cost of living in the geographic area where the taxpayer resides; (4) the amount of property which is available to pay the

---

[16](...continued)
that is not part of the instant record. The Court has disregarded that document. See Rule 143(b).

[17] Rev. Proc. 2000-15, sec. 4.02(1)(c), 2000-1 C.B. at 448, provides, in pertinent part, that "the determination of whether a requesting spouse will suffer economic hardship * * * will be based on rules similar to those provided in § 301.6343-1(b)(4) of the Regulations on Procedure and Administration."

taxpayer's expenses; (5) any extraordinary circumstances such as special education expenses, a medical catastrophe, or a natural disaster; and (6) any other factor that the taxpayer claims bears on economic hardship. See sec. 301.6343-1(b)(4)(ii), Proced. & Admin. Regs.

In the instant case, the outstanding taxes, additions to tax, and assessed interest for the 3 years in issue totaled approximately $13,182 as of the date of trial. Petitioner contends that she will suffer a substantial economic hardship if she is not relieved of liability for this sum. Petitioner cites her work as a sales clerk at Capretto Shoes while raising two young children without support from Mr. Barrera due to his imprisonment, her monthly mortgage payment, and the children's daycare expenses in support of her contention.

On the record before us, we do not think that petitioner has provided evidence sufficient to support a finding of economic hardship. Petitioner provided no information about her household income and expenses in either the request for innocent spouse relief or the questionnaire she submitted to respondent. At trial, petitioner testified with specificity only with respect to her monthly mortgage payment of $1,000 (not including taxes and insurance), preschool expenses of $400 a month for her son (although this expense was expected to end the following school year when her son starts kindergarten), and payments to a live-in

nanny of $270 a week.  Petitioner stated that her monthly expenses also include food, clothing for her and the children, vehicle expenses, and homeowners' association dues, but she did not testify to or otherwise establish the dollar amounts she pays for these expenses.

On the matter of her income, petitioner's testimony was similarly vague and incomplete.  Petitioner earns approximately $15 an hour from her full-time job as a sales clerk at Capretto Shoes, which she testified translated to take-home earnings of "maybe $1,200, $1,300 a month."  Petitioner testified she is "hardly" able to pay her expenses with her salary and that she uses credit cards to pay her expenses.  Petitioner also receives monetary assistance from her family "Every blue moon" when she needs help, but she did not state the amount of money she receives from her family, nor did she provide any clear indication as to the frequency of the assistance.

Regarding petitioner's assets, the record shows that petitioner is the sole owner of the West Kendall house where she and her children reside, which was purchased after she and Mr. Barrera sold their Pine Bay Estates house in October 2000. Petitioner testified she paid approximately $234,000 or $236,000 for the West Kendall house, with a mortgage of about $210,000, but petitioner gave no evidence about the source of the cash for the downpayment on the home.  There is evidence that the net

proceeds from the sale of the Pine Bay Estates house were about $150,000, but there is no indication whether or not petitioner had control over or access to these proceeds or any portion thereof.  Additionally, petitioner at one point had an individual retirement account from which she received a $20,000 distribution in taxable year 2000, but she presented no evidence regarding the balance of the account after the distribution or whether she has any other savings, retirement or otherwise.

Other than the mortgage on the West Kendall house, petitioner presented no specific evidence regarding the existence or amount of any debts she may have.  Petitioner stated she currently pays household expenses with credit cards, but she did not testify to or otherwise establish the amount, if any, of her credit card debt.  The record indicates that Mr. Barrera was paying household expenses with his credit cards after the failure of his mortgage company, but it appears that petitioner is not liable for this credit card debt, as petitioner and Mr. Barrera maintained separate credit cards during their marriage.

Petitioner has a bachelor's degree in business management, work experience in a professional capacity, and gainful employment with the same employer for several years.  Although payment of the outstanding liabilities will certainly reduce petitioner's expendable income, petitioner has not demonstrated that payment of the liabilities would prevent her from paying

reasonable basic living expenses. See sec. 301.6343-1(b)(4), Proced. & Admin. Regs. Petitioner's references to most of her expenses are broad, generalized, and afford no meaningful way to arrive at a monthly outlay. Absent more specific evidence regarding her basic living expenses, as well as her income, her current debts, and all of her current assets, we do not think that petitioner has met her burden of establishing that she would suffer economic hardship if she were denied equitable relief from the liabilities in issue.

Although petitioner has failed to establish that she will suffer economic hardship, we recognize that, if relief is not granted, petitioner will remain liable for paying the outstanding liabilities of $13,182, plus related interest. The facts before us are inconclusive as to whether petitioner's payment of the outstanding liabilities would not cause her to experience economic hardship. See Rev. Proc. 2000-15, sec. 4.03(2)(d), 2000-1 C.B. at 449. Consequently, we find that economic hardship is a neutral factor in this case. See Fox v. Commissioner, T.C. Memo. 2006-22; Madden v. Commissioner, T.C. Memo. 2006-4.

3. Abuse

Petitioner was not abused by Mr. Barrera at any time during their marriage. Therefore, this factor is neutral.

    4.  Knowledge or Reason To Know

    The relevant knowledge in the case of a reported but unpaid

liability is whether the taxpayer knew or had reason to know that

the tax would not be paid at the time the return was signed.

Rev. Proc. 2000-15, sec. 4.03(1)(d) and (2)(b), 2000-1 C.B. at

448-449; see also Washington v. Commissioner, 120 T.C. at 150.

Accordingly, for this factor to weigh in favor of relief,

petitioner must establish that, at the time she signed the 1998

joint return on May 23, 2000, the 1999 joint return on November

2, 2000, and the 2000 joint return on July 24, 2001,[18]

_____

    [18]  In the instant case, the joint return for 1998 was
stamped as received by the IRS on May 30, 2000, the joint return
for 1999 was stamped as received on Nov. 15, 2000, and the 2000
joint return was stamped as received on Aug. 6, 2001.  There is
no dispute that these were the dates the joint returns were
filed.  Petitioner's testimony, however, raises an issue as to
when she signed the joint returns.  Petitioner admitted that she
signed the returns, but she did not know the dates she signed
them, nor did she recall whether a particular return was timely
or late when she signed it.  The joint return for taxable year
1998 shows a handwritten signature date for both petitioner and
Mr. Barrera of "5-23-00", the 1999 joint return shows a typed
signature date for both petitioner and Mr. Barrera of "11-02-00",
and the 2000 joint return shows a typed signature date for both
petitioner and Mr. Barrera of "7/24/01".  Petitioner testified
that she did not write the dates shown on the returns next to her
signatures and that she was not sure she signed the returns on
the particular dates listed.  Petitioner further testified that
she had "no clue" if she signed a particular return "three months
earlier and * * * [Mr. Barrera's] just turning it in at whatever
time he wants to turn it in."
    Although we accept petitioner's testimony that she did not
write the signature dates on the 1998, 1999, and 2000 joint
returns, this fact does not convince us that petitioner signed
the returns on dates other than those shown next to her
signatures.  There is no dispute that petitioner voluntarily
                                              (continued...)

she did not know and had no reason to know that Mr. Barrera would

---

18(...continued)
signed each of the returns, and there is no indication in the record that these returns were not fully completed by the return preparer when she signed them. Other than her testimony, petitioner presented no persuasive evidence that the 1998, 1999, and 2000 returns were not, in fact, signed on the dates following her signatures. Given that petitioner does not know and does not recall when she signed the returns or whether the returns were timely or late when she signed them, coupled with the fact that the returns in evidence are each stamped as having been received by respondent within 2 weeks of the dates shown next to petitioner's and Mr. Barrera's signatures, we find that petitioner signed the returns on the dates shown following her signatures.

Although we have no reason to find that petitioner did not sign the joint returns for the years in issue on dates other than those shown next to her respective signatures, for the sake of completeness, we address an issue raised with respect to the joint return for taxable year 1998. As we note above, there is no indication that the joint returns for taxable years 1998, 1999, and 2000 were not completed by the return preparer at the time petitioner signed them. Presumably, because the joint returns were completed and signed by the return preparer, petitioner signed each return, at the earliest, on the date following the return preparer's signature. In Biller v. Commissioner, T.C. Memo. 1976-97, affd. 544 F.2d 1343 (5th Cir. 1977), the Court found that although no date appeared next to petitioner's signature on a joint return, the return showed a date of Oct. 8, 1971, next to the signature of the return preparer and was "obviously signed by petitioner on or after that date". Petitioner's 1999 and 2000 joint returns each show the same date next to her and Mr. Barrera's signatures and next to the signature of the return preparer, and thus support a finding that petitioner signed the 1999 and 2000 returns on Nov. 2, 2000, and July 24, 2001, respectively.

The 1998 joint return, however, shows a handwritten signature date of May 25, 1999, for the return preparer, which, if accurate, is almost a full 12 months prior to the handwritten signature dates of May 23, 2000, shown for both petitioner and Mr. Barrera. Petitioner did not proffer any specific evidence relating to this discrepancy, and we are not persuaded by the return preparer's signature date or by petitioner's testimony that she signed the 1998 joint return on a date other than the date of May 23, 2000, shown next to her and Mr. Barrera's signatures.

not pay the liabilities reported on the returns.

Petitioner contended at trial that she did not know and had no reason to know that the liabilities reported on the joint returns for taxable years 1998, 1999, and 2000, would not be paid because she did not know that the returns showed any taxes due when she signed them. In support of her contention, petitioner testified that she did not prepare the returns in issue, never reviewed or looked through the returns when she signed them, and never asked Mr. Barrera about paying the reported liabilities.

For purposes of our analysis herein, we are willing to accept petitioner's contention that she did not see the balance due amounts reported on the 1998, 1999, and 2000 joint returns and thus did not have actual knowledge that Mr. Barrera would not pay those liabilities when she signed the respective returns. Nonetheless, petitioner must still establish that she had no reason to know that Mr. Barrera would not pay the reported liabilities at the times she signed the joint returns.

In order to satisfy the reason to know factor, a taxpayer must establish that it was reasonable for the taxpayer to believe that his or her spouse would pay the reported liability at the time the taxpayer signed the return. See, e.g., Hopkins v. Commissioner, 121 T.C. 73, 88-89 (2003); Knorr v. Commissioner, T.C. Memo. 2004-212; Morello v. Commissioner, T.C. Memo. 2004-181; Keitz v. Commissioner, T.C. Memo. 2004-74; Ogonoski v.

Commissioner, T.C. Memo. 2004-52; Wiest v. Commissioner, T.C. Memo. 2003-91; see also Rev. Proc. 2000-15, sec. 4.02(1)(b), 2000-1 C.B. at 448. Additionally, if a taxpayer knows enough facts to be put on notice of the possibility of an underpayment, the taxpayer has a duty to inquire further to determine the amount of his or her tax liabilities. See Chou v. Commissioner, T.C. Memo. 2007-102; Motsko v. Commissioner, T.C. Memo. 2006-17; Feldman v. Commissioner, T.C. Memo. 2003-201, affd. 152 Fed. Appx. 622 (9th Cir. 2005). A taxpayer is not relieved of this duty of inquiry solely because the taxpayer relied on his or her spouse to take care of the tax returns. See Hayman v. Commissioner, 992 F.2d 1256, 1262 (2d Cir. 1993), affg. T.C. Memo. 1992-228; Morello v. Commissioner, supra. A taxpayer cannot obtain the benefits of relief from joint and several liability simply because the taxpayer turned a "blind eye" by not reviewing the contents of a joint return and then failed to make further inquiry into the ultimate tax liability shown on the return. Price v. Commissioner, 887 F.2d 959, 965 (9th Cir. 1989), revg. an Oral Opinion of this Court; Levin v. Commissioner, T.C. Memo. 1987-67.

In the instant case, Mr. Barrera never physically or otherwise prevented petitioner from paging through the joint returns for the years in issue, and petitioner admitted in her testimony that she was "sure" she could have looked through the

returns had she wanted to do so.  Yet petitioner never reviewed the joint returns before she signed them, and she never asked Mr. Barrera about paying the reported liabilities because, as she admitted, she "wouldn't have even looked at the tax return[s] to see if anything was due, to begin with."  Petitioner testified that she "signed blindly" because she trusted that Mr. Barrera "would do the best" for her and her family.  Based on the instant record, we find that petitioner essentially, and admittedly, turned a "blind eye" toward the filing of the 1998, 1999, and 2000 joint tax returns and the failure to pay the taxes shown thereon.

A taxpayer who signs a return without reviewing it is charged with constructive knowledge of its contents, including the tax due shown on that return.  Hayman v. Commissioner, supra at 1262; see also Park v. Commissioner, 25 F.3d 1289, 1299 (5th Cir. 1994), affg. T.C. Memo. 1993-252; Castle v. Commissioner, T.C. Memo. 2002-142; Cohen v. Commissioner, T.C. Memo. 1987-537. Thus, despite the fact that petitioner signed the 1998, 1999, and 2000 joint returns without reviewing them or discussing them with Mr. Barrera, she should have known of the taxes shown due thereon.

Having found that petitioner had constructive knowledge of the taxes shown due on the 1998, 1999, and 2000 joint returns, we further find that, under the facts of this case, it was not

reasonable for petitioner to believe Mr. Barrera would pay the reported liabilities at the times she signed the returns. The record shows that when petitioner signed the joint returns for taxable years 1998, 1999, and 2000 on May 23, 2000, November 2, 2000, and July 24, 2001, respectively, she was well aware of the financial difficulties facing her family. Mr. Barrera's mortgage brokerage business had, in petitioner's words, "failed" in 1998 as a result of a Federal criminal investigation, and Mr. Barrera, the sole earner in the family at that time, lost the necessary mortgage licenses to continue with that line of work. Thereafter, in late 1999, petitioner and Mr. Barrera put their "fabulous" Pine Bay Estates house on the market and, after its eventual sale a year later in October 2000, purchased the less expensive "mediocre" West Kendall house. Petitioner was "sick to sell" the Pine Bay Estates house and was not "a happy party" to its sale, and she admitted that, when the Pine Bay Estates house had to be sold, she knew there were financial problems facing her family. Petitioner further testified that by 2000, Mr. Barrera was working "less and less" at his successor home improvement loan business, and when he quit renting commercial office space for the business and moved the office into their home, petitioner realized that Mr. Barrera could no longer pay the rent for the commercial office space. Petitioner testified that she also knew by 2000 that she had to agree to Mr. Barrera's repeated requests

that she take a $20,000 early withdrawal from her IRA or, as she testified, she would "end up under a bridge". Also in 2000, petitioner returned to work at a job outside the home for the first time in her marriage to Mr. Barrera since her pregnancy with their first child in 1996.

In light of the foregoing, we cannot conclude that it was reasonable for petitioner to believe that Mr. Barrera would pay three income tax bills in the approximate amounts of $3,700, $2,900, and $3,700. Although these unpaid amounts may have not been significant enough to cause petitioner concern in the early years of her marriage to Mr. Barrera, when his yearly adjusted gross income was approximately $199,000 and his mortgage brokerage business was operating, by the time she signed the 1998, 1999, and 2000 joint returns in May 2000, November 2000, and July 2001, respectively, when petitioner and Mr. Barrera's reported adjusted gross income for a family of four was down to $14,165 for 1999, $24,446 for 2000, and $2,108 for 2001, the unpaid amounts were significant enough to put a reasonable person in petitioner's circumstances on notice that further inquiry about their payment was warranted.

At trial, petitioner testified that had she seen the tax amounts reported as due on the returns for the years in issue, she would have assumed that Mr. Barrera would pay them. We have no reason to doubt petitioner's truthfulness on this matter.

Despite her assumption, however, we cannot find that, at the time the returns were signed, petitioner had no reason to know that the reported taxes would not be paid. Petitioner completed courses in accounting, finance, and business law, among others, in the process of earning her bachelor's degree in business management. She has work experience in a professional capacity, most notably as a loan officer assisting individuals with the completion of their residential mortgage loan applications. Thus, petitioner is neither uneducated nor unsophisticated as to financial matters. Additionally, nothing in the record suggests that Mr. Barrera deceived petitioner or concealed information from her regarding family finances. Although petitioner contends on brief that, after the close of his mortgage brokerage business, Mr. Barrera was paying family living expenses with credit cards without her knowledge, we do not find this indicative of any deceit or concealment on Mr. Barrera's part, particularly in light of petitioner's consistent testimony that she never asked Mr. Barrera about family finances because "it was just not * * * [her] concern", and she never discussed paying bills with Mr. Barrera because "[t]hat was his job, and my job was to raise my children." Moreover, petitioner admitted in her testimony that, although Mr. Barrera "always lived the life that everything was fine", she knew things were changing financially by at least 1999.

This Court has consistently applied the principle that the provisions providing relief from joint and several liability are "'designed to protect the innocent, not the intentionally ignorant'". Morello v. Commissioner, T.C. Memo. 2004-181 (quoting Dickey v. Commissioner, T.C. Memo. 1985-478). In petitioner's case, the joint returns for taxable years 1998, 1999, and 2000 each showed a balance due on the line stating "AMOUNT YOU OWE". Petitioner was aware of the financial difficulties facing her family at the respective times she signed these returns, yet she did not even look at each return to determine whether she and Mr. Barrera owed tax or were due a refund of overpaid tax. Under the circumstances of this case, we cannot find that petitioner had no reason to know that Mr. Barrera would not pay the balances shown as owing. At a minimum, petitioner did not meet her well-established duty of inquiry with respect to payment of those balances.

On the record before us, we conclude that petitioner has not established that she did not know, nor did she have reason to know, that the liabilities reported on the joint returns for taxable years 1998, 1999, and 2000 would not be paid at the respective times she signed returns. This factor weighs against relief.

5.   Nonrequesting Spouse's Legal Obligation To Pay Tax

At the time this case was tried, petitioner had filed a petition for dissolution of her marriage to Mr. Barrera, but a final judgment of dissolution had not been issued by the court. Petitioner argues, however, that the legal obligation factor weighs in favor of relief because, as part of the dissolution proceedings, she and Mr. Barrera had entered into a marital settlement agreement under which Mr. Barrera had assumed the obligation to pay the outstanding joint Federal income tax liabilities for taxable years 1998, 1999, and 2000 in their entirety.

Because petitioner had not yet obtained a final judgment of dissolution, it is not clear that the marital settlement agreement imposed a legal obligation upon Mr. Barrera to pay the outstanding liabilities at the time this case was tried.  Even taking the marital settlement agreement into consideration, however, we do not think that this factor favors relief in this case.  The legal obligation factor weighs in favor of relief only if the requesting spouse did not know or have reason to know that, at the time the divorce decree or agreement was entered into, the nonrequesting spouse would not pay the liability.  Rev. Proc. 2000-15, sec. 4.03(1)(e), 2000-1 C.B. at 449.  On the facts of this case, petitioner had reason to know that Mr. Barrera would not pay the outstanding liabilities at the time she and Mr.

Barrera entered into the marital settlement agreement.  At the time petitioner and Mr. Barrera entered into the marital settlement agreement, Mr. Barrera was approximately 1 year into serving his 27-month sentence for conspiring to defraud the United States in connection with his mortgage brokerage business. In the years prior to his conviction on this charge, Mr. Barrera had lost his mortgage broker license, his mortgage brokerage business had failed, and his and petitioner's reported adjusted gross income had fallen from approximately $199,000 in 1995 to $2,108 in 2001.  By the time of his conviction in October 2002 and subsequent incarceration in April 2003, Mr. Barrera was not working and had no income, and petitioner admitted that Mr. Barrera was living with her and the children because "he had no money" and "nowhere to go".  The facts and circumstances of this case thus establish that petitioner knew or had reason to know that, at the time she entered into the marital settlement agreement, Mr. Barrera would not pay the liabilities at issue. Accordingly, this factor is neutral.

6.  Attributable to Nonrequesting Spouse

The balance due on the joint return for taxable year 1998 was attributable to self-employment tax on income earned by Mr. Barrera from his Schedule C activity as a business consultant. The balance due on the joint return for taxable year 1999 was attributable to the 10-percent additional tax on early

distributions under section 72(t) imposed on a $38,261 distribution from Mr. Barrera's IRA.[19]  The balance due for taxable year 2000 was attributable to the 10-percent additional tax under section 72(t) imposed on IRA distributions totaling $37,119, of which $20,000 was distributed from petitioner's IRA.

On these facts, it appears that the unpaid taxes for taxable years 1998 and 1999 are solely attributable to Mr. Barrera and thus would weigh in favor of relief for those years, but the unpaid tax for taxable year 2000 is almost equally attributable to petitioner and Mr. Barrera and thus would not weigh in favor of relief for that year.  This is not the end of our inquiry, however, as we believe several additional facts should be considered under the particular circumstances of this case.

First, Mr. Barrera's self-employment income in 1998 and the funds distributed from his IRA in 1999 were used in great part for living expenses of both petitioner and Mr. Barrera, as was the $20,000 distributed from petitioner's IRA in 2000. Petitioner testified, however, that she took the $20,000 IRA

---

[19]  In 1999 and 2000, petitioner, in her individual capacity, received interest income of $79 and $19, respectively. However, respondent stipulates that the "entire balances due" on the 1999 and 2000 joint returns arose from the 10-percent additional tax under sec. 72(t) imposed on the early distributions from Mr. Barrera's and petitioner's IRAs. Accordingly, petitioner's small amounts of interest income in 1999 and 2000 do not affect our analysis of the attribution factor.

distribution in 2000 at the insistence of Mr. Barrera, and we thus recognize Mr. Barrera's influence with respect to this income. Ultimately, though, petitioner agreed to Mr. Barrera's request for the distribution because she knew that she and her family needed the money or, as she testified, she would "end up under a bridge", and she further knew there would be tax consequences to the distribution.

We next note that the unpaid additions to tax and interest for taxable years 1998 and 1999 are the result of petitioner and Mr. Barrera's failure to timely file their joint income tax returns, and the unpaid additions to tax and interest for those years and for taxable year 2000 are the result of petitioner and Mr. Barrera's failure to pay their income taxes when they were due. All taxpayers have a duty to file timely and accurate returns and to pay the amounts shown as due on those returns. See generally secs. 6001, 6011(a), 6012(a)(1), 6072(a), 6151(a). Petitioner's reliance on Mr. Barrera, therefore, to handle the preparation and filing of their joint returns for taxable years 1998, 1999, and 2000 does not establish that the additions to tax and interest for those years are solely attributable to Mr. Barrera.

Under these circumstances, we find that the attribution factor weighs somewhat in favor of relief for taxable years 1998

and 1999, but it does not weigh in favor of relief for taxable year 2000.

7.   Significant Benefit

The record shows that the funds from the unpaid liabilities were used by Mr. Barrera to pay his family's household and living expenses during taxable years 1998, 1999, and 2000.  We thus find that petitioner did not significantly benefit "beyond normal support" from the unpaid liabilities for taxable years 1998, 1999, and 2000.  This factor is neutral.

8.   Noncompliance With Federal Income Tax Laws

Petitioner has complied with Federal income tax laws for the years following taxable year 2000, the last year in issue. This factor is neutral.

Conclusion

A factor favoring relief for all three of the years in issue is that petitioner and Mr. Barrera are separated and petitioner is seeking dissolution of their marriage.  Also somewhat favoring relief, at least for taxable years 1998 and 1999, is that the underpayments are attributable to income earned by Mr. Barrera, though we note that petitioner, who had no or minimal income during these years, enjoyed the use of Mr. Barrera's income.

The factors favoring relief are strongly outweighed by petitioner's knowledge or reason to know that the reported

liabilities would not be paid at the respective times she signed the 1998, 1999, and 2000 joint returns--especially because knowledge or reason to know that a tax would be unpaid is "an extremely strong factor weighing against relief." Rev. Proc. 2000-15, sec. 4.03(2)(b), 2000-1 C.B. at 449. We are also mindful of petitioner's failure to demonstrate that she would suffer economic hardship if relief were not granted, and that the tax balances due for the years in issue are partly attributable to late filing and failure to pay additions to tax and related interest and, for taxable year 2000, petitioner's $20,000 distribution from her IRA.

On the basis of the facts and circumstances presented, we find that it would not be inequitable to hold petitioner liable for the outstanding liabilities for taxable years 1998, 1999, and 2000. We, therefore, conclude that petitioner is not entitled to equitable relief from joint and several liability under section 6015(f). In reaching this conclusion, we have considered all arguments made by the parties and, to the extent not mentioned above, we conclude that they are irrelevant or without merit.

To reflect the foregoing,

Decision will be entered

for respondent.