T.C. Memo. 2006-17

UNITED STATES TAX COURT

MICHAEL R. MOTSKO, Petitioner, AND CHERYL MANNS, Intervenor <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 4624-03.              Filed February 2, 2006.

<u>Peter B. Brautigam</u> and <u>Michael Jungeris</u>, for petitioner.

Cheryl Manns, pro se.

<u>Julie L. Payne</u>, for respondent.

MEMORANDUM OPINION

HOLMES, <u>Judge</u>:  Michael Motsko is a skilled mechanic who
runs a trucking company and repair shop in Fairbanks, Alaska.
His estranged wife used to keep the books, but she was less than
honest in preparing their taxes and ended up serving time for

signing false returns.  Motsko has already won relief from joint liability for their 1985-92 taxes.  He now seeks relief for 1993 and 1996.

## Background

Motsko graduated from high school in Minnesota in 1972 and began working in construction.  He learned over time to run the heavy equipment used on major construction projects and in 1975 moved to Alaska, where he helped build the Trans-Alaska pipeline.  He has never taken a business course, and only learned how to balance a checkbook in 2002.

He met Cheryl Manns in 1982, and they married the next year.  They have two children: a son who is now grown and a daughter still in high school who lives with Motsko.  Motsko and Manns earned their living from two businesses that they cofounded.  The first changed names as it changed its line of work--starting out as Independent Excavating, and then becoming Evergreen Construction before finally settling on its current name of Evergreen Trucking.  The last shift began when Motsko bought a truck and lowboy (a wheeled bed on which a driver places cargo to be hauled by the truck), but the move was ill-timed.  The Alaskan construction industry went into recession in the 1980s when oil prices collapsed, and the trucking business followed.  Evergreen's business fizzled and, unable to afford a driver, Motsko took over the driving himself.

In 1988, Motsko and his wife formed a second business, the Hydraulics Center. It was a natural outlet for Motsko's growing skill as a heavy equipment mechanic. It also gave the family an income when the construction industry went into its long annual hibernation.

From the beginning of their relationship, Manns had taken care of all of Motsko's finances. And this continued when they started their businesses: Manns handled all the paperwork, wrote the checks, and helped their accountants prepare the tax returns, while Motsko did the excavating, drove the truck, and made the repairs. Manns also wrote almost all the checks for the family bills. If Motsko needed some money, he would occasionally borrow the appropriate checkbook to pay for a specific service, such as a doctor's appointment, or a part needed by one of the businesses. But before he took the checkbook, he would generally clear it with Manns to make sure that they had enough money in the right account.

We specifically find Manns never deliberately lied to him about anything having to do with their money and that Motsko had access to all of their financial records. We also find, however, that he did not ask her many questions and never reviewed their financial records: As far as he knew, she paid all their bills on time, and we believe him when he testified that it was proof

enough for him that no vendor had ever refused to do business with them because of nonpayment.

Motsko might, however, have noticed something that was quite unusual had he dug into those records--Manns, unbeknownst to him, had drawn up and filed an agreement establishing herself and her brother as partners of the Hydraulics Center business. According to this agreement, Manns had a 51% interest and her brother the remainder. And although the Hydraulics Center was a partnership between Manns and her brother, the business license on file with the State of Alaska was in her name only. Motsko, in other words, seemed to own no part of the business where he worked. To add to his troubles, he was also at least partially responsible for loans he and Manns took out to run the Hydraulics Center, because Manns drew up the paperwork for these loans and Motsko signed them without looking too closely.

Around 1995, the IRS began auditing Motsko and Manns's returns. Manns let Motsko know about this; however, she said that it was common for businesses to be audited and that it was nothing to worry about. This case proved to be an exception. Manns, it seems, had never filed a 1993 tax return. She finally prepared and filed one--which Motsko signed--in October 1995. This return reported taxes and penalties due of $11,945. While Motsko was aware of the audit, he was not overly concerned by it, and assumed that Manns would pay the taxes just like she would any other bill.

In 1996, Motsko began having serious back pain, and so Evergreen's truck and lowboy sat idle for weeks at a time. He decided to sell them because of their carrying cost, and he negotiated the selling price of $158,684. The truck and lowboy were completely depreciated, so nearly the entire sale proceeds would be taxable income, but Motsko and Manns did not set aside a reserve. One reason for their failure is that the sale proceeds might have been earmarked for settling a lawsuit brought against Motsko, for reasons unknown, by a man named Jerry Sadler. Motsko and Manns settled that suit in 1996 for $100,000, but whether the money came from a loan or from the cash realized by the lowboy sale is unclear. It is also possible that money from the sale went toward construction on the Hydraulics Center property.

Then their troubles snowballed. In February 1997, Manns was indicted on 13 counts of making and subscribing false income tax returns for tax years 1985 and 1986, and 1988 through 1992. In May, she pleaded guilty to five of these counts, and promised to pay all back taxes, penalties, and interest. In September, she also filed a sentencing statement saying that she accepted full responsibility for her actions.

Motsko was never at any time implicated in her crimes, but the criminal investigation did not cause them to change their usual distribution of responsibilities. And with the criminal case hanging over her, Manns had not taken the time to prepare

their 1996 tax return. When she did finally prepare and file it in October 1997, the return reported taxes and penalties due of $45,172. By then, she had already pleaded guilty and been sentenced. And Motsko had by then read her letter accepting responsibility for her actions. But even then, he still relied on her to run the finances. In answering his lawyer's question about whether he was aware of the amount of tax due when he signed the return, Motsko testified:

> Yes, I remember when I signed the taxes that, you know, I remember being it was a big sum, and what I do remember is I asked Cheryl about it, and Cheryl says, she says, well, I've got a check in. She said I'm going to be incarcerated, she said, so I can't do nothing about it until I get back, and that's where it - it's it, that's where it was.

The 1993 and 1996 returns were never audited, and the Commissioner accepted them as filed. The IRS started a collection action against Motsko and Manns in July 1998, and filed liens against their assets in October 1999. In November 1999, Motsko filed for innocent spouse relief for 1993 and 1996. After the Commissioner denied it, Motsko petitioned this Court to review the Commissioner's decision. The case was tried in Alaska, where Motsko resided when he filed his petition. Manns intervened, believing that Motsko should remain liable with her for the unpaid 1993 and 1996 taxes.

## Discussion

A married couple can choose to file their Federal tax

returns jointly.  Sec. 6013(a).[1]  If they do, both are responsible for the return's accuracy, and both are jointly and severally liable for the entire tax due.  Sec. 6013(d)(3); <u>Butler v. Commissioner</u>, 114 T.C. 276, 282 (2000).

This can lead to harsh results, and so section 6015 lets a spouse ask for relief from joint and several liability on three grounds.  Section 6015(b) lets a spouse seek relief if he can show that he neither knew, nor had reason to know, of an understatement on the return; section 6015(c) lets divorced or separated spouses split their tax liability.  Both these provisions, however, require that the liability in question arise from a "deficiency," meaning that a couple has underreported their taxable income.  In tax years 1986 through 1992, Manns did understate their joint income.  Motsko knew nothing about it, and the Commissioner granted him relief for those years under section 6015(b).

Tax years 1993 and 1996 are a different story.  For those years, there was no deficiency--the problem Motsko faced was that part of the tax due went unpaid.  That left him able to seek relief only under section 6015(f), because that section allows relief where "it is inequitable to hold the individual liable for any unpaid tax or any deficiency (or any portion of either)."

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code as in effect for the year at issue.

Sec. 6015(f).  The Commissioner has issued revenue procedures to guide the exercise of his discretion, and Revenue Procedure 2000-15 was the one in effect when Motsko asked for relief.  Rev. Proc. 2000-15, 2000-1 C.B. 447.  We routinely refer to that revenue procedure when we review what the Commissioner did, see, e.g., Washington v. Commissioner, 120 T.C. 137, 147-152 (2003); Jonson v. Commissioner, 118 T.C. 106, 125-126 (2002), affd. 353 F.3d 1181 (10th Cir. 2003), though we have also considered other factors, Ewing v. Commissioner, 122 T.C. 32, 48-49 (2004), appeal docketed, No. 04-73237 (9th Cir.).

We begin by noting that Motsko has the burden of proof.  Alt v. Commissioner, 119 T.C. 306, 311 (2002), affd. 101 Fed. Appx. 34 (6th Cir. 2004).  This means that he must show that the Commissioner's denial of relief was arbitrary, capricious, or without sound basis in fact.  Jonson, 118 T.C. at 125; Butler, 114 T.C. at 292.  We have, however, ruled that the Commissioner's determination to deny relief under section 6015(f) is subject to de novo review.  Ewing v. Commissioner, 122 T.C. at 38-39.  The Commissioner's continuing disagreement with Ewing made him argue in this case that we should limit Motsko to the evidence that was before the Appeals officer who denied his relief.  Ewing binds us, though, so we considered evidence that Motsko presented for the first time at trial.

We begin our analysis with the revenue procedure's list of conditions that a person trying to win innocent spouse relief under section 6015(f) *must* show.  These include proof that he filed a joint return, did not qualify for relief under section 6015(b) or (c), and did not fraudulently transfer property to anyone to avoid paying taxes.  Rev. Proc. 2000-15, sec. 4.01, 2000-1 C.B. 448.  Both Manns and the Commissioner admit that Motsko meets all these conditions.

We next see if Motsko qualifies for the safe harbor under section 4.02 of the Revenue Procedure.  Rev. Proc. 2000-15, sec. 4.02, 2000-1 C.B. 448.  The safe harbor has three conditions, and if Motsko shows that he met them, he would ordinarily get relief.  One of the three, however, is that he did not know when he signed the returns that the tax liability would not be paid.  To prove this, Motsko must show (1) that when he signed the joint return, he neither knew or had reason to know that tax reported on each of the returns would not be paid; and (2) that it was reasonable for him to believe that Manns would pay the reported tax for the year.  Id.

We find that Motsko did not actually know in 1995 (when he signed the 1993 return) that the tax would not be paid, but we do find he had reason to believe it wouldn't be.  Motsko is right to say his wife had paid all of their reported taxes in the past, but by 1995 he knew that their returns for several years were

being audited.  He also knew that he was signing the 1993 return more than a year late.  This was enough to trigger his "duty of inquiry," because a reasonable person in his position would have gotten suspicious that Manns was no longer behaving as expected. See Feldman v. Commissioner, T.C. Memo. 2003-201, affd. 152 Fed. Appx. 622 (9th Cir. 2005) (knowledge of an ex-spouse's deteriorating mental condition should have caused the taxpayer to inquire into whether his ex-spouse had paid their taxes). Instead of taking a closer look at what was going on, however, Motsko continued to have nothing to do with the finances.  This was not reasonable.

By the time he signed the 1996 return, we find that he actually knew that the tax would not be paid.  Manns had already been indicted on 13 counts of tax evasion and pleaded guilty to 5 of them.  He knew that she was on her way to jail, and he testified that she had told him that there was nothing that she could do about the taxes due on the 1996 return until after she was released.  See Kleinman v. Commissioner, T.C. Memo. 1994-19 (wife charged with knowledge after husband indicted).

This leaves the balancing test--eight factors to consider in deciding whether relief would be "equitable."  Rev. Proc. 2000-15, sec. 4.03, 2000-1 C.B. at 448.  These factors are not the only ones that the Commissioner and we can look at, but they are where we start.  Rev. Proc. 2000-15, sec. 4.03, 2000-1 C.B. at

448; Ewing, 122 T.C. at 48.  Those about which the parties agree
are in italics:

| Weighs for Relief | Neutral | Weighs against Relief |
|---|---|---|
| No knowledge | | Knowledge |
| Economic hardship | | No economic hardship |
| No significant benefit[2] | | Significant benefit |
| | *Later compliance with Federal tax laws* | No later compliance with Federal tax laws. |
| Liability attributable to non-requesting spouse. | | Liability attributable to petitioner. |
| Nonrequesting spouse responsible for tax under divorce decree. | No divorce decree. | Petitioner responsible for tax under divorce decree. |
| *Separated or divorced.* | Still married. | |
| Abuse present. | *No abuse present.* | |

We address each factor that the parties disagree about.

Knowledge:  As discussed above, Motsko either knew or had
reason to know that the 1993 and 1996 taxes would not be paid.
This factor weighs against relief.

---

[2]  Rev. Proc. 2000-15, sec. 4.03, 2000-1 C.B. at 448, does
not state that the absence of a significant benefit will weigh in
a petitioner's favor, but only that a significant benefit will
weigh against relief.  Nonetheless, we decided in Ewing, 122 T.C.
at 46 (and other cases cited), that the absence of a significant
benefit should be a positive factor for petitioners.

Economic hardship: We must figure out whether Motsko will suffer economic hardship if his request for relief is not granted. The revenue procedure refers us to the regulation in section 301.6343-1(b)(4), Proced. & Admin. Regs., which defines economic hardship as the inability to pay reasonable basic living expenses if taxes were paid instead. In Motsko's case, those taxes (and penalties) total over $57,000. As for his living expenses, section 301.6343-1(b)(4), Proced. & Admin. Regs., directs us to consider such factors as the cost of living in Alaska, how much of Motsko's property is exempt from levy, his earning ability, and any extraordinary circumstances.

Motsko reported on a "Collection Information Statement for Wage Earners" (an IRS form submitted in support of his request for relief) that his monthly wages were $5,154 and that his monthly expenses (including about $800 a month for his daughter's hockey programs) were $7,527,[3] leaving him with a monthly deficit of $2,373.[4] The current allowable living expenses for a two-

---

[3] Motsko listed his monthly expenses:

| | |
|---|---:|
| Food, clothing and misc. | $ 1,170 |
| Housing and utilities | 2,963 |
| Transportation | 92 |
| Health care | 326 |
| Taxes (income and FICA) | 1,024 |
| Other expenses | 1,952 |
| Total living expenses | 7,527 |

[4] Motsko gave no evidence to the revenue agent to corroborate his income or expenses, but under Ewing we considered the evidence he presented at trial anyway.

person household in Alaska at Motsko's stated level of income, according to the Commissioner's guidelines,[5] is $1,182.

Motsko also has many assets that he could likely sell without undue hardship. He has $10,738 in cash or cash equivalents,[6] plus $285,105 of equity in his house and an additional $10,000 of equity in an adjacent lot. He has an unencumbered Harley Davidson motorcycle and a small all-terrain vehicle. What looks to be either an understatement of income or overstatement of expenses, when combined with these assets, leads us to find that Motsko would not suffer economic hardship should we deny his request for relief. These assets were tied up in the divorce proceedings between Motsko and Manns when the case was tried; that does not render them valueless without some showing by Motsko that he would have no hope of regaining control over them.

Significant benefit: The question here is whether Motsko significantly benefited--beyond normal support--from the underpayment of the 1993 and 1996 taxes. The couple owed 1993 taxes of $11,945 on AGI of $56,968. The high cost of living in Alaska and the absence of any suggestion that Motsko's standard of living increased leads us to conclude that he did not

---

[5] http://www.irs.gov/businesses/small/article/0,,id=104935,00.html.

[6] These assets include cash on hand, personal savings and checking accounts, and other investments.

significantly benefit beyond normal support in 1993.

In 1996, the couple owed taxes of $43,255 on adjusted gross income of $189,765.[7]  Most of this income came from the sale of the lowboy and truck.  Whether the proceeds of that sale went to settle the Sadler lawsuit or to construction on the Hydraulics Center is not clear.  If the money went to settle the lawsuit, Motsko certainly benefited by being relieved of that debt.  If it went to the Hydraulics Center, he may not have received any significant benefit if Manns's paperwork actually deprived him of any interest in that business.  Yet even with his equity in the Hydraulics Center in dispute, he admitted that the Center was at the very least a main source of his income.  Our decision on this factor for 1996 therefore flows from the burden of proof--Motsko had it, and he didn't show where the money went, so we find that he did not prove that he received no significant benefit.

Attribution:  For 1993, the total AGI reported was $56,968; the revenue agent attributed 68% of this amount, or $38,992, to Motsko's work in Evergreen Trucking, which the agent deemed to be Motsko's Schedule C business.  For 1996, the couple reported total AGI of $189,765; this included $158,684 from Evergreen Trucking's sale of the truck and lowboy, and another $546 from Evergreen Trucking.  This gave Motsko, in the agent's estimation,

---

[7]  The couple's taxable income was $169,069, making their tax assessed $47,141.  However, the Motskos had paid withholding and excess FICA of $4,141, making their overall tax due for 1996 $43,255.

84% of the total income for the year even though Motsko argues that he never saw a penny from the lowboy sale.

The agent seems to have concluded that Motsko earned all revenue coming from Evergreen Trucking and Manns earned everything that come from the Hydraulics Center. This is questionable--the couple seemed to divide the labor in both businesses fairly equally. Even though we acknowledge that Motsko may just be an employee of the Hydraulics Center instead of a partner, the fact remains that the revenue agent attributed all the income from the Hydraulics Center to Manns. Neither of the parties provided us with evidence to rebut the revenue agent's conclusion. What we do know, however, is that at least part of the taxes due can be attributed to the income-producing activities of Motsko. Thus, this factor weighs against relief.

<u>Payment responsibility</u>: Motsko and Manns did not have a final divorce decree when the case was tried, so this factor is neutral.

<u>Other Factors</u>: Motsko also urges us to consider Manns's sole responsibility for the tax crimes stemming from their returns as a positive factor. While we encourage all taxpayers to avoid indictment, we also think doing so should be presumed rather than rewarded as a positive factor in seeking innocent spouse relief.[8]

---

[8] In <u>Ewing</u>, we did state that failure to "participate in any wrongdoing"--at least when that wrongdoing was concealed from the
(continued...)

When the table is reset to reflect our findings, it looks like this:

| Weighs for Relief | Neutral | Weighs against Relief |
|---|---|---|
|  |  | Knowledge |
|  |  | No economic hardship |
| No significant benefit--1993 |  | Significant benefit --1996 |
|  | Later compliance with Federal tax laws |  |
|  |  | Liability attributable to petitioner. |
|  | No divorce decree. |  |
| Separated or divorced. |  |  |
|  | No abuse present. |  |

The final tally--even for the more favorable year, 1993--is two factors weighing toward relief, three neutral, and four weighing against.  We agree with the Commissioner that Motsko and Manns's separation, and Motsko's lack of significant benefit in 1993, are outweighed by the three negative factors (knowledge, economic hardship, and attribution) present--especially since knowledge or reason to know that a tax would be unpaid is "an extremely strong factor weighing against relief, Rev. Proc. 2000-

---

[8](...continued)
spouse asking for relief--could be a positive factor.  Ewing, 122 T.C. at 48.  But the wrongdoing in Ewing was underpaying the taxes, not filing feloniously false returns, and Manns's crimes did not affect the two tax years litigated in this case.

15, sec. 4.03, 2000-1 C.B. at 449.  We therefore conclude that the Commissioner did not abuse his discretion in denying Motsko relief from joint and several liability for tax years 1993 and 1996.

<u>Decision will be entered for</u>

<u>respondent</u>.