T.C. Memo. 2011-16

UNITED STATES TAX COURT

VALARIE NADINE HAFNER STEPHENSON, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 9072-09.                    Filed January 20, 2011.

Valarie Stephenson, pro se.

<u>Anna A. Long</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  Pursuant to section 6015(e)(1),[1] petitioner
seeks review of respondent's determination that she is not
entitled to relief from joint and several liability under section

---

[1]  Unless otherwise indicated, all section references are to
the Internal Revenue Code, as amended, and Rule references are to
the Tax Court Rules of Practice and Procedure.

6015(f) with respect to her Federal income tax liability for 1999.[2]

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of facts and accompanying exhibits are incorporated herein by this reference. Petitioner resided in California at the time she filed her petition.

## I. Petitioner's Relationship With Sean Stephenson

Petitioner met Sean Stephenson (Mr. Stephenson) in 1990 when she was a freshman and he was a junior at the same high school in Phoenix. He proposed the following school year. They were married on May 12, 1991, shortly after Mr. Stephenson graduated from high school and enlisted in the U.S. Marine Corps (Marine Corps).

After the wedding Mr. Stephenson was stationed in Sacramento and petitioner remained in Phoenix to begin her junior year of high school. Three months into her junior year petitioner dropped out and moved to Sacramento to live with Mr. Stephenson. She never graduated from high school and has failed the General Education Development (GED) test three times.[3]

---

[2] On brief petitioner abandoned her argument that respondent erred in denying her relief under sec. 6015(b) and (c).

[3] Petitioner also suffered from learning disabilities that forced her to be held back in elementary school.

During their time in Sacramento Mr. Stephenson began verbally abusing petitioner, often making fun of her lack of education and learning disabilities in front of Mr. Stephenson's family and their friends. In 1994 Mr. Stephenson completed his service in the Marine Corps, and they moved back to Phoenix. The verbal abuse turned into physical abuse, and Mr. Stephenson began throwing items at petitioner when he became angry.

In 1997 or 1998 Mr. Stephenson moved to Henderson, Nevada, for a business opportunity.[4] Petitioner remained in Phoenix for 6 months until Mr. Stephenson found suitable housing. They lived in Henderson for approximately 9 months before moving back to Phoenix.[5]

Petitioner and Mr. Stephenson lived in Dallas from 1999 until 2002. Mr. Stephenson worked as a stockbroker and day-trader, and petitioner worked at a doctor's office. Mr. Stephenson was highly successful, and he purchased a number of cars including a BMW that petitioner drove to work. They lived in three different condominiums during their time in Dallas.

---

[4] At some point between 1994 and his departure for Henderson Mr. Stephenson became a licensed stockbroker.

[5] Petitioner worked as a receptionist at a doctor's office in Henderson.

II.  Mr. Stephenson's Financial Control and the 1999 Federal Income Tax Liability

At all relevant times Mr. Stephenson managed the couple's finances.[6] He did not allow petitioner access to the mail box or to a filing cabinet that contained the checkbook and financial documents, both of which required a key that only Mr. Stephenson possessed.[7] When Mr. Stephenson needed petitioner to sign something, he placed it in front of her and told her where to sign. If petitioner asked what she was signing, Mr. Stephenson made threats of violence or told her she was not intelligent enough to understand.

Petitioner and Mr. Stephenson jointly filed Form 1040, U.S. Individual Income Tax Return, for 1999 (the return) showing $214,711 of taxable income and tax owed of $77,865.[8] No payment was included with the return, and the return showed only a $915 withholding credit.[9]

_____

[6] Petitioner and Mr. Stephenson shared at least one joint checking account, and petitioner used a debit card to make household purchases. Most other purchases required Mr. Stephenson's permission.

[7] In order to have access to her important personal documents, petitioner hid from Mr. Stephenson her birth certificate, passport, and marriage certificate in a Bible.

[8] The Internal Revenue Service (IRS) received the return on Oct. 18, 2000, and assessed the tax on Nov. 20, 2000.

[9] Mr. Stephenson made a $20,000 payment to the U.S. Treasury on Apr. 10, 1999. It is unclear whether this payment was intended to be the first of four quarterly estimated tax

(continued...)

Beginning in August 2004 and continuing throughout 2006 petitioner and Mr. Stephenson made regular payments to the Internal Revenue Service (IRS), attempting to pay off the 1999 tax liability. At the direction of Mr. Stephenson petitioner wrote at least five of the checks.[10]

III.  San Diego:  2002-2006

In 2002 petitioner and Mr. Stephenson moved to San Diego. During their time in San Diego they lived in highrise condominiums, and petitioner worked as a personal trainer.[11] Many of the condominiums had gyms and/or swimming pools that petitioner took advantage of.

Petitioner attempted to leave Mr. Stephenson in 2003. When she informed him of her decision he pushed her against a wall, grabbed his gun, pointed it at her head, and told her that he would kill her or himself if she left him. Petitioner became so frightened that she decided to remain in the relationship.

In 2005 petitioner met Mike Thomas (Mr. Thomas), a fire engineer with the City of San Diego Fire Department. Petitioner routinely walked her dog around the fire station, and one day she

---

[9](...continued)
payments, but it was the only one made during 1999. The IRS reduced the tax liability by $20,000 as a result of the payment.

[10] The checks were made out to the "United States Treasury", "I.R.S.", or "Internal Revenue Service".

[11] The couple reported adjusted gross income of $110,711 on their 2004 Form 1040.

and Mr. Thomas began talking. Mr. Thomas immediately noticed bruises on petitioner's body. At some point within the first year of their friendship petitioner confided in Mr. Thomas that the bruises came from Mr. Stephenson and that she was in an abusive relationship.

IV. Petitioner Files for Divorce

On February 23, 2007, petitioner left Mr. Stephenson while he was in Flagstaff, Arizona. Mr. Thomas drove petitioner and whatever belongings she could grab to her mother's house in Phoenix. He also lent petitioner money since she had none.

When petitioner arrived in Phoenix, she contacted a divorce attorney but was told that she needed to reside in Arizona for 3 months before she could file for divorce. During the 3-month waiting period Mr. Stephenson appeared at petitioner's mother's house and an altercation ensued resulting in petitioner's obtaining an order of protection against Mr. Stephenson.[12] In June 2007, with financial assistance from Mr. Thomas, petitioner hired an attorney to begin the divorce proceedings. The decree of dissolution of marriage (divorce decree) was finalized on June 5, 2008.[13]

---

[12] Mr. Stephenson had the order of protection quashed.

[13] The divorce decree ordered Mr. Stephenson to: (1) Pay petitioner spousal maintenance of $500 per month for 8.5 years; and (2) pay the IRS any outstanding tax liability incurred by joint filing regardless of whether petitioner is granted innocent

(continued...)

V.   Petitioner's Federal Income Tax Compliance and Request for Innocent Spouse Relief

Petitioner lived in Phoenix from February 23 until December 7, 2007.  In an attempt to take financial control of her life she timely filed her own Federal income tax return for 2006.  She did not, however, include any payment with her return, believing that the IRS would send her a bill when the due date approached.  Although the IRS eventually sent petitioner a bill, which she paid immediately, the due date had already passed and her payment was untimely.

In April 2007 petitioner called the IRS to ensure that her payment had been received.  During the phone call petitioner became aware for the first time of the unpaid 1999 joint tax liability and her and Mr. Stephenson's failure to file a 2005 Federal income tax return.  The IRS told petitioner about the possibility of innocent spouse relief for the 1999 tax liability and her opportunity to file a separate 2005 tax return since no previous joint return had been filed for that tax year.  Petitioner filed her own 2005 tax return and requested information on innocent spouse relief.  She has since timely filed her 2007, 2008, and 2009 Federal income tax returns and received refunds for 2008 and 2009.

---

[13](...continued)
spouse relief.

On January 11, 2008, petitioner filed Form 8857, Request for Innocent Spouse Relief, requesting relief from joint and several liability for the 1999 and 2004 tax years.[14] Respondent preliminarily denied petitioner's request for relief for 1999 because it was untimely.[15] Petitioner appealed, and respondent's Appeals Office also denied petitioner's request because it was untimely.

After petitioner filed a petition with the Court challenging respondent's determination, Peggy Ryan (Ms. Ryan), a tax examiner with the IRS, considered petitioner's claim for relief on the merits and determined that petitioner is not entitled to relief under section 6015(f).

## VI. Current Situation

Petitioner lives in a bedroom in Mr. Thomas' basement in San Diego.[16] She is unemployed and unable to pay the rent.[17]

---

[14] Respondent granted petitioner's request for innocent spouse relief for 2004.

[15] The preliminary determination stated: "IRC section 6015 requires innocent spouse claims to be filed no later than two years after the date we start collection activity against you".

[16] Petitioner moved back to San Diego after she decided that it would be safer for her to live in Mr. Thomas' house and easier to find work in a city she was familiar with.

[17] Mr. Thomas expected petitioner to pay rent of $700 per month but as she struggled to find and keep work he lowered the rent to $400 per month.

Since returning to San Diego petitioner has held four jobs and quit three of them.[18] She is not eligible to receive unemployment benefits because she quit her most recent job, and she has not received the $500 per month of spousal maintenance that she is entitled to since August 2008.

In June 2009 Mr. Thomas helped petitioner buy a car by cosigning the sale contract. Because petitioner cannot afford the $536 monthly car payment, Mr. Thomas lends her the money each month.

Mr. Thomas estimates that petitioner owes him over $10,000.[19] They decided that she would begin to repay the debt once she finds employment and is able to afford making the payments.[20] Petitioner also owes her divorce attorney $800.

## OPINION

In general, a spouse who files a joint Federal income tax return is jointly and severally liable for the entire tax liability. Sec. 6013(d)(3). However, a spouse may be relieved from joint and several liability under section 6015(f) if: (1) Taking into account all the facts and circumstances, it would be inequitable to hold her liable for any unpaid tax; and (2) relief

---

[18] Petitioner's most recent job paid her $10 per hour.

[19] Petitioner keeps track of the amount she owes Mr. Thomas but did not have the current figures with her at trial.

[20] In the meantime petitioner has sold her jewelry in an attempt to pay down her debt to Mr. Thomas.

is not available to the spouse under section 6015(b) or (c).  The Commissioner has published revenue procedures listing the factors the Commissioner normally considers in determining whether section 6015(f) relief should be granted.  See Rev. Proc. 2003-61, 2003-2 C.B. 296, superseding Rev. Proc. 2000-15, 2000-1 C.B. 447.

In determining whether petitioner is entitled to section 6015(f) relief we apply a de novo standard of review as well as a de novo scope of review.  See Porter v. Commissioner, 132 T.C. 203 (2009); Porter v. Commissioner, 130 T.C. 115 (2008). Petitioner bears the burden of proving that she is entitled to relief.  See Rule 142(a); Alt v. Commissioner, 119 T.C. 306, 311 (2002), affd. 101 Fed. Appx. 34 (6th Cir. 2004).

A.  Threshold Conditions for Granting Relief

In order for the Commissioner to determine that a taxpayer is eligible for section 6015(f) relief, the requesting spouse must satisfy the following threshold conditions:  (1) She filed a joint return for the taxable year for which she seeks relief; (2) relief is not available to her under section 6015(b) or (c); (3) no assets were transferred between the spouses as part of a fraudulent scheme by the spouses; (4) the nonrequesting spouse did not transfer disqualified assets to her; (5) she did not file or fail to file the returns with fraudulent intent; and (6) with

enumerated exceptions,[21] the income tax liability from which she seeks relief is attributable to an item of the nonrequesting spouse.[22]  Rev. Proc. 2003-61, sec. 4.01, 2003-2 C.B. at 297-298.

_____

[21]  The relevant exception for our purposes states:

> If the requesting spouse establishes that * * * she was the victim of abuse prior to the time the return was signed, and that, as a result of the prior abuse, the requesting spouse did not challenge the treatment of any items on the return for fear of the nonrequesting spouse's retaliation, the Service will consider granting equitable relief although the * * * underpayment may be attributable in part or in full to an item of the requesting spouse.

Rev. Proc. 2003-61, sec. 4.01(7)(d), 2003-2 C.B. 296, 298.

[22]  Rev. Proc. 2003-61, sec. 4.01, 2003-2 C.B. at 297-298, also lists a seventh threshold condition:  "The requesting spouse applies for relief no later than two years after the date of the Service's first collection activity * * * with respect to the requesting spouse."  We held in Lantz v. Commissioner, 132 T.C. 131 (2009), revd. 607 F.3d 479 (7th Cir. 2010), that the 2-year limitation imposed by sec. 1.6015-5(b)(1), Income Tax Regs., and restated in Rev. Proc. 2003-61, sec. 4.01, is an invalid interpretation of sec. 6015(f).  In Hall v. Commissioner, 135 T.C. ___ (2010), we decided to adhere to our holding in Lantz in cases appealable in jurisdictions other than the Seventh Circuit. In the present case, which is appealable to the Court of Appeals for the Ninth Circuit, we continue to hold that the 2-year limitation imposed by sec. 1.6015-5(b)(1), Income Tax Regs., is an invalid interpretation of sec. 6015(f) and therefore need not decide whether petitioner brought her claim for relief within 2 years of the first collection activity.  See Hall v. Commissioner, supra; Lantz v. Commissioner, supra; Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971).

        We note that it would have been impossible for petitioner to have been made aware of any collection activity relating to the 1999 unpaid tax liability before her April 2007 phone call to the IRS.  Mr. Stephenson prevented petitioner from accessing the mail and threatened her when she asked questions about their finances.
                                                            (continued...)

Respondent concedes that conditions (1), (2), (3), (4), and (5) are met. As to condition (6), we presume on the basis of petitioner's testimony that a small portion of the tax liability is attributable to income she earned.[23] We find, however, that the abuse exception in Rev. Proc. 2003-61, sec. 4.01(7)(d), applies. See supra note 21. Mr. Stephenson abused petitioner throughout their marriage, and she did not question or disobey him for fear of abuse. If we find that petitioner is entitled to relief on the basis of these circumstances, it would be inequitable to hold her liable for the amount of the tax liability attributable to the income she earned.

Accordingly, we find that petitioner has met the threshold criteria for relief as to the entire tax liability.

B. Circumstances Under Which Relief Is Ordinarily Granted

When the threshold conditions have been met, the Commissioner will ordinarily grant relief from an underpayment of tax if the requesting spouse meets the requirements set forth under Rev. Proc. 2003-61, sec. 4.02, 2003-2 C.B. at 298. To qualify for relief under Rev. Proc. 2003-61, sec. 4.02, the following elements must be satisfied: (1) On the date of the

---

[22](...continued)
It was only after petitioner left Mr. Stephenson and called the IRS that she became aware of the unpaid tax liability.

[23] Respondent concedes that a great majority of the tax liability is attributable to income earned by Mr. Stephenson and that condition (6) is met as to that amount.

request for relief the requesting spouse is no longer married to, or is legally separated from, the nonrequesting spouse, or has not been a member of the same household as the nonrequesting spouse at any time during the 12-month period ending on the date of the request for relief; (2) on the date the requesting spouse signed the return she had no knowledge or reason to know that the nonrequesting spouse would not pay the income tax liability; and (3) the requesting spouse will suffer economic hardship if relief is not granted.

When petitioner filed her request for relief on January 11, 2008, she was still married to Mr. Stephenson; and they were not legally separated although she had moved out in February 2007. Additionally, since petitioner and Mr. Stephenson were members of the same household until February 2007, they were members of the same household during the 12-month period preceding the date she filed for relief. Thus, petitioner is not entitled to relief under the criteria set forth in Rev. Proc. 2003-61, sec. 4.02.

C. Factors Used To Determine Whether Relief Will Be Granted

Where a requesting spouse meets the threshold conditions but fails to qualify for relief under Rev. Proc. 2003-61, sec. 4.02, a determination to grant relief may nevertheless be made under the criteria set forth in Rev. Proc. 2003-61, sec. 4.03, 2003-2 C.B. at 298-299. Rev. Proc. 2003-61, sec. 4.03, provides a nonexclusive list of factors the Commissioner will consider in

making that determination: (1) Whether the requesting spouse is separated or divorced from the nonrequesting spouse (marital status factor); (2) whether the requesting spouse would suffer economic hardship if not granted relief (economic hardship factor); (3) whether, at the time she signed the joint return, the requesting spouse knew or had reason to know that the nonrequesting spouse would not pay the income tax liability (knowledge factor); (4) whether the nonrequesting spouse has a legal obligation to pay the outstanding tax liability pursuant to a divorce decree or agreement (legal obligation factor); (5) whether the requesting spouse received a significant benefit from the unpaid income tax liability (significant benefit factor); and (6) whether the requesting spouse has made a good faith effort to comply with tax laws for the taxable years following the taxable year to which the request for such relief relates (compliance factor).

The Commissioner may consider two other factors that, if present in a case, will weigh in favor of granting relief: (1) Whether the nonrequesting spouse abused the requesting spouse (abuse factor); and (2) whether the requesting spouse was in poor mental or physical health at the time she signed the return or at the time she requested relief (mental or physical health factor). Id. sec. 4.03(2)(b), 2003-2 C.B. at 299. The absence of either factor will not weigh against granting relief. Id.

In making our determination under section 6015(f), we shall consider the factors set forth in Rev. Proc. 2003-61, sec. 4.03, and any other relevant factors. No single factor is to be determinative in any particular case, and all factors are to be considered and weighed appropriately. See Haigh v. Commissioner, T.C. Memo. 2009-140.

1. Marital Status

Consideration is given as to whether the requesting spouse is separated (whether legally separated or living apart) or divorced from the nonrequesting spouse. Rev. Proc. 2003-61, sec. 4.03(2)(a)(i), 2003-2 C.B. at 298. Petitioner separated from Mr. Stephenson on February 23, 2007, and they were divorced on June 5, 2008. Accordingly, this factor weighs in favor of granting relief.

2. Economic Hardship

A requesting spouse suffers economic hardship if paying the tax liability would prevent her from paying her reasonable basic living expenses.[24] Sec. 301.6343-1(b)(4)(i), Proced. & Admin.

---

[24] In determining a reasonable amount for basic living expenses, the Commissioner shall consider information provided by the taxpayer, including: (1) The taxpayer's age, employment status and history, ability to earn, number of dependents, and status as a dependent; (2) the amount reasonably necessary for food, clothing, housing, utilities, medical expenses, transportation, child support, and other necessities; (3) the cost of living in the geographical area in which the taxpayer lives; (4) the amount of property available to pay the taxpayer's expenses; (5) any extraordinary expenses, including educational

(continued...)

Regs.; Rev. Proc. 2003-61, sec. 4.02(1)(c), 4.03(2)(a)(ii), 2003-2 C.B. at 298. Respondent contends that petitioner failed to show that she would suffer economic hardship if not granted relief. We disagree.

Petitioner currently cannot afford to pay her basic living expenses. She is unemployed and not receiving the $500 per month of spousal maintenance that she is entitled to. Her only asset is her car, which she is currently paying off with money borrowed from Mr. Thomas, and she owes money to her divorce attorney and Mr. Thomas.

Respondent argues that we should not consider petitioner's current employment status in making our determination. He reasons that petitioner's unemployment is of her own volition and that her past job experience shows that she can find work if necessary. While we understand respondent's position, we believe that requiring petitioner, who has no assets and whose most recent job paid her $10 per hour, to pay a tax liability of more than $66,000[25] would cause her economic hardship.

---

[24](...continued)
expenses; and (6) any other factor that the taxpayer claims bears on economic hardship and brings to the Commissioner's attention. Sec. 301.6343-1(b)(4)(ii), Proced. & Admin. Regs.

[25] As of Oct. 9, 2007, the unpaid tax liability was $66,129.21. The current amount of the unpaid liability is substantially higher on account of more than 3 years of accrued interest.

Accordingly, the economic hardship factor weighs in favor of granting relief.

3. <u>Knowledge</u>

A third factor is whether the requesting spouse knew or had reason to know that the nonrequesting spouse would not pay the tax liability. In making the determination whether the requesting spouse had reason to know, consideration is given to, among other things: (1) The requesting spouse's level of education; (2) the requesting spouse's degree of involvement in the activity generating the income tax liability; (3) the requesting spouse's involvement in business and household financial matters; (4) the requesting spouse's business or financial expertise; and (5) any lavish or unusual expenditures compared with past spending levels. Rev. Proc. 2003-61, sec. 4.03(2)(a)(iii)(C), 2003-2 C.B. at 298. The presence of abuse by the nonrequesting spouse may mitigate the requesting spouse's knowledge or reason to know that the nonrequesting spouse would not pay the tax liability. <u>Id.</u> sec. 4.03(2)(b)(i), 2003-2 C.B. at 299.

We believe that petitioner did not know or have reason to know that Mr. Stephenson would not pay the tax liability. Mr. Stephenson controlled the couple's finances, and petitioner was not allowed access to any financial documents. Mr. Stephenson did not discuss with petitioner the filing of the return or

payment of the tax owed. Finally, Mr. Stephenson earned a substantial income in 1999 from which he had adequate funds to pay the tax owed. See Levy v. Commissioner, T.C. Memo. 2005-92 (finding the nonrequesting spouse's substantial earnings to be an important factor in holding that the requesting spouse did not have knowledge or reason to know that the tax liability would not be paid).

Additionally, the factors stated in Rev. Proc. 2003-61, sec. 4.03(2)(a)(iii)(C), favor granting relief: (1) Petitioner never graduated from high school and failed the GED test three times; (2) her involvement in the activities generating the income tax liability was extremely limited; (3) she had no involvement in business and household financial matters and limited business or financial expertise; and (4) any expenditures were commensurate with Mr. Stephenson's income.

Respondent cites Hayman v. Commissioner, 992 F.2d 1256 (2d Cir. 1993), affg. T.C. Memo. 1992-228, for the proposition that petitioner's signature gave her constructive knowledge of the information on the return and therefore reason to know that the tax liability would not be paid. In Hayman the Court of Appeals for the Second Circuit dealt with whether the requesting spouse, who signed the returns but did not review them, had constructive knowledge of the suspiciously large deductions. Id. at 1262. In holding that she did, the Court of Appeals stated that awareness

of such large deductions gave the requesting spouse reason to know of the possibility of an understatement of tax liability. Id.

We believe that respondent's reliance on Hayman is misplaced.  In a deficiency case such as Hayman the question is whether the requesting spouse knew or had reason to know of the item giving rise to the deficiency.  In the matter presently before the Court the question is not whether petitioner was aware of the existing tax liability at the time she signed the return but whether she knew or had reason to know at the time she signed the return that Mr. Stephenson would not pay the tax liability.

Respondent also argues that petitioner, because she earned taxable income in 1999, had a duty to inquire into whether Mr. Stephenson reported petitioner's income on the return and paid the appropriate taxes.  Respondent contends that petitioner's failure to satisfy her duty to inquire is enough for the Court to hold that she knew or had reason to know that Mr. Stephenson would not pay the tax liability.

Respondent relies on Feldman v. Commissioner, T.C. Memo. 2003-201, affd. 152 Fed. Appx. 622 (9th Cir. 2005).[26]  In Feldman the nonrequesting spouse handled the family's finances and

---

[26] Respondent also cites Motsko v. Commissioner, T.C. Memo. 2006-17, for support, but we stated in Motsko that the requesting spouse's duty to inquire was triggered after he became aware that previous returns were being audited.

misrepresented to the requesting spouse the family's financial situation. When the requesting spouse, a lawyer earning $16,000 per week, attempted to pay the outstanding tax liability, his check was presented to the bank against insufficient funds. We held that at the time the joint return was filed the requesting spouse had constructive knowledge that the outstanding tax liability would not be paid because a reasonable person in the requesting spouse's position would have inquired into his financial situation after receiving the bank statements from the nonrequesting spouse that "reflected obvious inconsistencies, and had dates printed in an irregular form." Id.

Unlike the requesting spouse in Feldman, petitioner had no apparent reason to doubt Mr. Stephenson's ability to pay the tax liability and no blatant factual inconsistencies to investigate.

We also note that requiring petitioner to inquire into whether Mr. Stephenson reported on the return the income she earned could have put her at risk of abuse. Petitioner's efforts to become more informed of what she was signing and questions about their finances in general resulted in threats of violence or verbal abuse from Mr. Stephenson.

Accordingly, we hold that at the time petitioner signed the joint return she had no knowledge or reason to know that Mr. Stephenson would not pay the tax liability, and the knowledge factor weighs in favor of granting relief.

4. Legal Obligation

Mr. Stephenson is legally obligated to pay the outstanding tax liability pursuant to the divorce decree. This weighs in favor of granting relief unless, as respondent argues, petitioner knew or had reason to know at the time the divorce decree was entered into that Mr. Stephenson would not pay the income tax liability. See Rev. Proc. 2003-61, sec. 4.03(2)(a)(iv), 2003-2 C.B. at 298.

Respondent contends that petitioner knew or should have known at the time the divorce decree was entered into that Mr. Stephenson would not pay the 1999 tax liability because before that date petitioner and respondent discussed Mr. Stephenson's failure to pay the 1999 tax liability and file a joint income tax return for 2005. We disagree.

We do not believe that petitioner's awareness of Mr. Stephenson's failure to pay the tax liability in April 2007 (as opposed to when the divorce decree was finalized) gave her reason to know that he would not pay the tax liability at the time the divorce decree was finalized.

We also disagree with respondent that petitioner's knowledge of Mr. Stephenson's failure to file a joint income tax return for 2005 gave her knowledge or reason to know that Mr. Stephenson would not pay the unpaid tax liability required by the divorce decree. See Levy v. Commissioner, T.C. Memo. 2005-92 (finding

that requesting spouse did not know or have reason to know that nonrequesting spouse would not comply with his legal obligation to pay unpaid tax liability despite history of noncompliance by nonrequesting spouse).  The divorce decree was the product of arm's-length negotiations between petitioner and Mr. Stephenson, each of whom was represented by an attorney.

Accordingly, we hold that the legal obligation factor weighs in favor of granting relief.

5.  Significant Benefit

A fifth factor is whether the requesting spouse received a significant benefit (beyond normal support) from the unpaid tax liability.  Rev. Proc. 2003-61, sec. 4.02(a)(v), 2003-2 C.B. at 299.  "A significant benefit is any benefit in excess of normal support."  Sec. 1.6015-2(d), Income Tax Regs.  "Normal" support is measured by the parties' circumstances.  Estate of Krock v. Commissioner, 93 T.C. 672, 678 (1989).

Respondent contends that petitioner significantly benefited from the unpaid tax liability in the form of the car she drove and the highrise buildings and their amenities that she took advantage of.  In determining whether this constitutes significant benefit (beyond normal support) we must consider that petitioner and Mr. Stephenson had net income of almost $150,000 in 1999 and Mr. Stephenson continued to be successful for a number of years.  See Bell v. Commissioner, T.C. Memo. 1989-107

(stating that net income needs to be considered in determining whether expenditures go beyond normal support).

Mr. Stephenson purchased the BMW that petitioner drove at the height of his success. We do not believe that Mr. Stephenson's purchase of the BMW and petitioner's driving of it to and from work is a benefit to petitioner that goes beyond normal support for a couple in their financial situation. Moreover, the car was not a gift to petitioner or purchased in her name.

We also do not believe that petitioner's highrise living in Dallas and San Diego amounts to a significant benefit from the unpaid tax liability. Mr. Stephenson was successful, and renting condominiums for himself and petitioner to live in does not provide petitioner with a benefit beyond normal support. The fact that the condominiums had a gym and/or swimming pool that petitioner took advantage of does not change this result.

Accordingly, the significant benefit factor weighs in favor of granting relief.

6. Compliance

Respondent argues that the compliance factor weighs against granting relief because: (1) Petitioner and Mr. Stephenson's 2004 joint income tax return contained a deficiency; (2) petitioner failed to file a 2005 Federal income tax return; and (3) petitioner failed to timely pay her 2006 Federal income tax.

We do not believe that the 2004 return's deficiency or the failure to file a 2005 return shows that petitioner has not made a good a faith effort to comply with the tax laws. Mr. Stephenson controlled the couple's finances in those years just as he did in 1999, and petitioner was subject to the same type of abuse. Additionally, the IRS granted petitioner innocent spouse relief for 2004, and petitioner filed a 2005 tax return as soon as she learned that Mr. Stephenson did not file a return for that year.

With respect to the 2006 tax year, we believe that petitioner made a good faith effort to timely pay even though her payment was made after the due date. She timely filed her 2006 return and believed that the IRS would send her a bill when the payment's due date approached. The IRS did send petitioner a bill, which she paid immediately; but it was sent after the due date and her payment was untimely. In this situation petitioner's failure to timely pay does not preclude her from having made a good faith effort to comply with the tax laws.

Finally, since tax year 2007 petitioner's compliance has been perfect. She timely filed her 2007 Federal income tax return and timely paid the tax owed. She also timely filed her 2008 and 2009 Federal income tax returns and received refunds for both years.

Accordingly, the compliance factor weighs in favor of granting relief.

7. <u>Abuse</u>

Abuse by the nonrequesting spouse favors relief. Rev. Proc. 2003-61, sec. 4.03(2)(b)(i). Abuse need not be physical. The Court has found that mental, emotional, and verbal abuse may incapacitate a requesting spouse in the same way as physical abuse. <u>Nihiser v. Commissioner</u>, T.C. Memo. 2008-135. Claims of abuse require substantiation or specificity in allegations. See <u>id.</u>; <u>Knorr v. Commissioner</u>, T.C. Memo. 2004-212.

Mr. Stephenson abused petitioner throughout their marriage. During trial petitioner provided specific examples of abuse, including a time when Mr. Stephenson threatened to kill her or himself if she left him and times when Mr. Stephenson threw items at her. Mr. Stephenson regularly humiliated petitioner in front of his family and their friends and demeaned her when she asked questions. Mr. Thomas corroborated some of petitioner's testimony by credibly testifying that petitioner had bruises on her body and told him that she was in an abusive relationship.

Respondent argues that petitioner's testimony is not credible because she did not document any of the abuse. We find that petitioner credibly testified to specific allegations of abuse that took place before she moved to San Diego and believe that Mr. Thomas' testimony substantiates petitioner's allegations

of abuse that took place while she was living in San Diego.  See Drayer v. Commissioner, T.C. Memo. 2010-257 (weighing abuse factor in favor of granting relief despite requesting spouse's failure to document abuse).

Accordingly, the abuse factor weighs in favor of granting relief.

8.  Mental or Physical Health

There is no evidence that petitioner was in poor mental or physical health at any relevant time.  Thus, this factor is neutral.

D.  Conclusion

In summary, seven factors favor relief and one factor is neutral.  After weighing the testimony and evidence in this fact-intensive case, we conclude that it is inequitable to hold petitioner liable for the 1999 joint tax liability.  Accordingly, we relieve petitioner from joint tax liability for tax year 1999.

We have considered all arguments made in reaching our decision and, to the extent not mentioned, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

Decision will be entered

for petitioner.